(No. 56332

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RAYMOND LEE STEWART, Appellant.

*Opinion filed November 30, 1984.—Rehearing denied February 1, 1985.*

WARD, J., took no part.
SIMON, J., concurring in part and dissenting in part.

G. Joseph Weller, Deputy Defender, and Kyle Wesendorf, Assistant Defender, of the Office of the State Appellate Defender, of Elgin, and Joel Teibloom, Assistant Public Defender, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Mark L. Rotert, Kenneth A. Fedinets and David E. Bindi, Assistant Attorneys General, of Chicago, of counsel), for the People.

CHIEF JUSTICE RYAN delivered the opinion of the court:

Raymond Lee Stewart was charged in a two-count indictment in the circuit court of Winnebago County with the murders of Willie Fredd and Albert Pearson (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(1)). A jury found defendant guilty on both counts. Following a separate sentencing hearing before the same jury, the defendant was sentenced to death. The sentence was stayed (87 Ill. 2d R. 609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d R. 603). For the reasons set forth below, we affirm defendant's conviction and sentence.

As shown by affidavits filed for the purpose of procuring search warrants, several murders and armed robberies were committed within a few days in the cities of Rockford, Illinois, and Beloit, Wisconsin. On January 27, 1981, Willie Fredd and Albert Pearson were shot and killed during the course of an armed robbery of Fredd's Groceries in Rockford. These are the murders involved in this case. On January 28, 1981, a Clark gasoline station in Rockford was robbed and a 17-year-old named Kaiser was slain with four gunshot wounds to his chest and one to his head. On January 29, 1981, the E-Z Go

gas station in Rockford was robbed and two victims were murdered by multiple gunshot wounds. On February 2, 1981, the Radio Shack at Beloit Plaza in Beloit, Wisconsin, was robbed and two men were murdered. One victim had five gunshot wounds to his body and the other four.

The defendant was convicted of the murder of Kaiser in the circuit court of Winnebago County and was sentenced to death. This court affirmed his conviction and sentence in *People v. Stewart* (1984), 104 Ill. 2d 463 (*Stewart I*). The defendant was convicted in the circuit court of Rock County, Wisconsin, of two counts of first-degree murder and one count of armed robbery for the Radio Shack robbery and killings in Beloit, and was sentenced to life imprisonment on each count of murder and an indeterminate term not to exceed 20 years on the armed-robbery count.

On January 27, 1981, at approximately 1 p.m., Willie Fredd and Albert Pearson were shot to death in Fredd's Groceries in Rockford, Illinois. There were no eyewitnesses to the shootings. At trial, Belinda Jarrett testified that she left Fredd's Groceries shortly before one o'clock on the day of the murders. As she crossed the street in front of the store, she observed an older maroon-colored automobile with a black top, yellow license plates, and a broken front grill speeding toward her. Although she could not identify the driver, she stated that she saw the car turn and drive toward a parking lot located behind the store.

Additional evidence established that on January 22, 1981, defendant had returned to Illinois after visiting his cousin, Florence Crosby, in Greensboro, North Carolina. Upon his return, defendant registered at the Westward Motel under the name of Alan Spaulding. The motel was located approximately two blocks from Fredd's Groceries. When defendant checked out of the motel on Jan-

uary 30, 1981, Delores Perdue, the motel manager, observed him drive off in a maroon-colored automobile. Katherine Waldvogel, a maid at the motel, was also present when defendant checked out and stated that she saw defendant enter and drive away in a maroon and black automobile with Wisconsin license plates. Subsequently, while cleaning defendant's room, Waldvogel and another maid found a laundry receipt with the name "Stewart" written at the top and a T-shirt containing the initials "R.S." These matters will be discussed in more detail later.

The evidence confirmed that defendant was the owner of a 1970 black-over-maroon Mercury with yellow Wisconsin license plates. It also showed that on February 4, 1981, defendant executed a 24-hour rental contract for a U-Haul trailer which he attached to his Mercury. Two days later, as a result of mechanical problems, defendant had the Mercury and U-Haul towed to his brother-in-law's home in Sycamore, Illinois. There he removed the trailer from the Mercury and hitched it to a red and white Buick Electra 225 which also belonged to Stewart. He then drove to Crosby's home in Greensboro, North Carolina.

On February 21, 1981, agents from the Federal Bureau of Investigation arrested defendant in the parking lot outside Crosby's apartment as he was about to enter the Buick. The arrest was made pursuant to a Federal arrest warrant which had been issued for unlawful flight to avoid prosecution. The warrant was issued on February 20, 1981, and was based on information that defendant had fled Illinois after committing an armed robbery in Rockford several weeks before the incident involved in this case.

Shortly after the arrest, Special Agent Leonard Bogaty of the Federal Bureau of Investigation went to Crosby's apartment. Following a brief conversation with

Crosby, Bogaty went to a bedroom shared by defendant and Crosby's young son and removed a number of defendant's items, including a large brown suitcase, a Polaroid camera and a camera case.

Later that day, FBI agents obtained a search warrant for defendant's suitcase and Buick. In the suitcase they found a loaded .38-caliber R&G revolver and a camera power pack. Among the items recovered from the Buick were a copy of an airline ticket dated January 22, 1981, in defendant's name; a U-Haul rental contract; a manila envelope containing personal papers; and a tan three-quarter-length man's coat with an unspent .38-caliber Smith & Wesson cartridge in the pocket. A number of witnesses testified at trial that the coat was similar to one that defendant had worn on previous occasions.

The next day, February 22, 1981, Agent Bogaty went to the home of Charlie Benton, defendant's uncle, in Whitsett, North Carolina, approximately five miles from Greensboro. Agent Bogaty observed the U-Haul trailer in the yard and inquired whether Benton had any objection to the FBI removing the trailer. Benton stated that he did not object, and the trailer was taken to the Greensboro police department, where it was searched the following day after agents obtained a search warrant. In the trailer, agents found a .38-caliber Smith & Wesson revolver and matching ammunition. Tests performed on the Smith & Wesson revolver determined that it was the weapon used to kill Fredd and Pearson. Tests were also performed on the tan coat recovered from the Buick. They revealed the presence of human blood in five areas, as well as gunshot powder residue on both sleeves.

With respect to the Smith & Wesson revolver and camera equipment found in defendant's possession, Cornelius Jones testified that in December 1980 he was robbed in the parking lot of a lounge in South Beloit by

a black man armed with a .32- or .38-caliber snub-nose revolver. When showed the .38-caliber R&G revolver recovered from defendant's suitcase, Jones stated that it looked like the same type of weapon that was pointed at him. Jones identified the Smith & Wesson revolver, Polaroid camera and attachments as the items taken from him during the robbery. He also stated that, because the assailant wore a ski mask, he was unable to identify him; however, following the robbery, he observed a red and white Buick Electra 225 drive out of the parking lot.

The defendant has raised 27 grounds for reversing his conviction and sentence. Many of these are divided into subissues. He first contends that factual misstatements were intentionally inserted in the warrant affidavits to deceive the magistrate, or that they were inserted with reckless disregard for the truth. Thus, he argues that the evidence obtained pursuant to the warrants should have been suppressed under *Franks v. Delaware* (1978), 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674.

As noted earlier, two Federal search warrants were issued; both were supported by affidavits of agents of the Federal Bureau of Investigation. The affidavit of Henry Phillips served as a basis for the warrant to search defendant's Buick and suitcase. The affidavit of Thomas Brerton, which incorporated the Phillips affidavit and supplemented it, supported the warrant authorizing a search of the U-Haul trailer. The focus of defendant's argument is on statements contained in the Phillips affidavit. Phillips had stated that he had personally received information from Illinois law-enforcement officials concerning six homicides committed during the course of four armed robberies. The affidavits, as noted earlier, set out seven homicides. He further advised the magistrate that ballistic evidence furnished by the Illinois Division of Criminal Investigation Laboratory had deter-

mined that all the homicides were related. With respect to the Fredd and Pearsons murders, the affidavit provided:

"*Armed Robbery #1*

On January 27, 1981, two black males, WILLIE FREDD, and ALBERT PEARSON, were shot and killed during the course of an armed robbery of Fredd's Grocery Store [*sic*] at Rockford, Illinois, and that from witnesses who were at the location of the robbery shortly prior to the discovery of the victims it was determined that the perpetrator had been operating a maroon 1970 Mercury with Wisconsin license and that this vehicle was observed behind Fredd's Grocery Store [*sic*]. Additional investigation determined that RAYMOND LEE STEWART was staying at the Westwood Motel [*sic*] and was registered under an alias however, was identified by motel personnel from his photograph.

RAYMOND LEE STEWART was arrested in 1972 [*sic*] for armed robbery as a result of the identification of WILLIE FREDD. Further investogation [*sic*] by said officers identified STEWART as having been operating a 1970 maroon Mercury with Wisconsin license while at this motel."

It is undisputed that the quoted language contains a number of factual misstatements. The statement attributing the description of the automobile to "witnesses who were at the location of the robbery" was inaccurate since that information was supplied by only one witness, Belinda Jarrett. Also, the description of the automobile was an embellishment of the description given by Jarrett. In reality, she did not know the year or make of the vehicle, nor did she positively state that it had Wisconsin license. Rather, in her statement to police, she described the vehicle as an older maroon-colored automobile with a black top, broken front grill and yellow license which she thought to be Wisconsin. Lastly, attributing the Mercury to the "perpetrator" was inaccurate, as there was nothing in Jarrett's statement that tied the Mercury to the individual who com-

mitted the murders. These misstatements, defendant argues, were included deliberately or with reckless disregard for the truth to bolster the facts upon which the magistrate was to make a probable-cause determination.

To further support his contention, defendant cites two additional misstatements. The first was contained in a separate portion of the Phillips affidavit dealing with an armed robbery on January 29, 1981, at the E-Z Go gas station in Rockford. The affidavit stated that two victims had been murdered and that bullets removed from the bodies were identical to bullets removed from Fredd and Pearson. Actually, however, only one person was murdered during the robbery. The second erroneous statement provided that, "[a]t the time of his arrest, [defendant] was residing at 600-C Banner Street, the residence of CHARLIE BENTON [sic], and that they [sic] executed a waiver form and advised and showed officers the location of STEWARTS property ***." In reality, Florence Crosby resided at the Banner Street address and consented to a search of her apartment; Benton lived a short distance away in Whitsett, North Carolina.

Under Illinois law, prior to *Franks v. Delaware*, a defendant was precluded from attacking the veracity of sworn statements contained in a search warrant affidavit. (See *People v. Laws* (1981), 84 Ill. 2d 493, 504.) *Franks v. Delaware* provided a limited exception to this general rule. There is still a presumption of validity with regard to a search warrant affidavit. (*Franks v. Delaware* (1978), 438 U.S. 154, 171, 57 L. Ed. 2d 667, 682, 98 S. Ct. 2674, 2684.) To overcome the presumption of validity, a defendant must make a substantial preliminary showing that false statements were deliberately included in the affidavit, or included with a reckless disregard for the truth, and that the statements were necessary to a finding of probable cause. If these conditions are met, the defendant is entitled to an evidentiary hearing where he must prove his allega-

tions of perjury or reckless disregard for the truth by a preponderance of the evidence. He must also show that, if the false statements are excised, there is insufficient material remaining to establish probable cause. *Franks v. Delaware* (1978), 438 U.S. 154, 171-72, 57 L. Ed. 2d 667, 682, 98 S. Ct. 2674, 2684-85. See also *People v. Laws* (1981), 84 Ill. 2d 493, 505.

At a pretrial suppression hearing, the trial court afforded defendant a full evidentiary hearing to substantiate his claim of improper conduct. Among the witnesses called by defendant were Patrick Young, special agent of the Illinois Department of Law Enforcement, and Laverne Pickett, a detective with the Rockford police department. Young and Pickett were responsible for gathering the information concerning the series of armed robberies and homicides and relaying it to FBI agents Phillips and Brerton. Both Young and Pickett denied that they informed the Federal agents that the "perpetrator" was operating a 1970 maroon Mercury with Wisconsin license. Rather, they testified that they informed Phillips and Brerton that a witness had observed an older maroon-colored vehicle with yellow license, which she thought to be Wisconsin, pull into the parking lot behind Fredd's Groceries. As to the discrepancy between the information they supplied and the statements which appeared in the affidavit, Pickett testified:

> "The only thing that I know is that I discussed with the agents that the witness they [*sic*] observed had a particular color older vehicle, with what she thought was Wisconsin plates; and I also discussed with the agents that we had determined that our suspect drove an older vehicle, which was a 1970 Mercury, maroon color, with Wisconsin plates. Now, how it came out on the affidavit that the witness said that, I don't know * * *."

At the conclusion of the evidence, the trial court ruled that the defendant had failed to sustain his burden of es-

tablishing either a deliberate falsehood or reckless disregard for the truth. The court also found that, viewing the affidavit as a whole, even if the misstatements were omitted, there was still sufficient information to support a probable-cause finding.

It is well established that a trial court's ruling on a motion to suppress will not be set aside unless manifestly erroneous. (*E.g., People v. Long* (1983), 99 Ill. 2d 219, 231; *People v. Williams* (1974), 57 Ill. 2d 239, 246.) From our review of the record, we conclude that the trial court did not err in refusing to suppress the evidence obtained pursuant to the search warrants. There was no evidence that the misstatements were deliberately inserted in the affidavit to deceive the magistrate or that they were the product of a reckless disregard for the truth. Indeed, the evidence only showed that there were, in fact, a number of incorrect statements.

Defendant argues that the use of the term "perpetrator," by itself, establishes an intentional falsity or reckless disregard for the truth. At the hearing, defendant conceded that the term originated with Phillips, since he argued to the court that neither Young nor Pickett used the word perpetrator when they relayed their information to Phillips. Yet Phillips was not called to testify regarding how the word came to be included in his affidavit. Thus, all we are left with is defendant's assertion that it was a deliberate falsehood or reckless disregard for the truth. *Franks* makes it clear, however, that mere conclusory allegations are insufficient to overcome the effect of sworn statements in an affidavit. A defendant must prove by a preponderance of the evidence his charge of perjury or reckless disregard for the truth. 438 U.S. 154, 156, 57 L. Ed. 2d 667, 672, 98 S. Ct. 2674, 2676.

Defendant further asserts that the number of factual misstatements evinces reckless conduct. Again, there is nothing in the record to substantiate this allegation. More-

over, we are mindful of the Supreme Court's admonition that search warrant affidavits are to be "tested and interpreted by magistrates and courts in a commonsense and realistic fashion." (*United States v. Ventresca* (1965), 380 U.S. 102, 108, 13 L. Ed. 2d 684, 689, 85 S. Ct. 741, 746.) This approach was utilized by the trial court when it properly considered the circumstances under which the affidavits were prepared. (See *United States v. Ciammitti* (6th Cir. 1983), 720 F.2d 927, 932; *United States v. Young Buffalo* (9th Cir. 1979), 591 F.2d 506, 511.) The court observed that "masses of information were being transmitted through large numbers of people" regarding the four armed robberies and six homicides. Considering that all the information had to be synthesized, sifted, condensed, and relayed to FBI agents unfamiliar with the crimes, it is not unreasonable that certain inaccuracies were included in the affidavits. Viewed in this light, we cannot say the trial court erred in concluding that the misstatements were not intentional or the result of a reckless disregard for the truth.

Defendant next contends that the trial court erred in refusing to quash the search warrants on the ground that certain information was deliberately omitted from the affidavit in a calculated effort to deceive the magistrate. According to defendant, had the information been included, the magistrate would not have found probable cause to issue the search warrant.

At the suppression hearing, defendant introduced 47 police reports dealing with the investigation of the four armed robberies and six homicides to support his claim that exculpating information was intentionally withheld from the magistrate. He also called Randall Oldenburger, a Rockford police officer, to testify concerning information he had received from two couples, Mr. and Mrs. Kunde and Mr. and Mrs. Satness, who allegedly drove together past Fredd's Groceries around the time of the murders.

After considering the evidence, the trial court, applying the test set forth in *Franks v. Delaware*, ruled that defendant had failed to make a substantial preliminary showing of a deliberate attempt to withhold information for the purpose of deceiving the magistrate.

This court has not previously addressed the question whether a search warrant can be invalidated on the basis that material facts were omitted from the supporting affidavit. In *Franks v. Delaware*, the Supreme Court dealt solely with the situation where false statements were intentionally or recklessly included in the affidavit. The court observed "it would be an unthinkable imposition upon [the magistrate's] authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment." (438 U.S. 154, 165, 57 L. Ed. 2d 667, 678, 98 S. Ct. 2674, 2681.) We believe that this principle applies with equal force to the intentional omission of information necessary to a probable-cause determination. *United States v. Willis* (9th Cir. 1981), 647 F.2d 54, 58; *United States v. Martin* (5th Cir. 1980), 615 F.2d 318, 329; *United States v. Dorfman* (N.D. Ill. 1982), 542 F. Supp. 345, *aff'd* (7th Cir. 1982), 690 F.2d 1217; *People v. Hothersall* (1981), 103 Ill. App. 3d 183; *People v. Reynolds* (1981), 96 Ill. App. 3d 79; *People v. Townsend* (1980), 90 Ill. App. 3d 1089; 2 W. LaFave, Search and Seizure sec. 4.4 (Supp. 1984).

Undoubtedly, not all omissions, even if intentional, are sufficient to invalidate an affidavit. (See, *e.g., United States v. Mankani* (2d Cir. 1984), 738 F.2d 538; *United States v. Martin* (5th Cir. 1980), 615 F.2d 318; *Schmid v. State* (Alaska 1980), 615 P.2d 565; *State v. Lehnen* (La. 1981), 403 So. 2d 683.) Indeed, an affiant may have omitted facts on the reasonable belief that they were immaterial or privileged (*People v. Kurland* (1980), 28 Cal. 3d 376, 618 P.2d 213, 168 Cal. Rptr. 667), or he may have found that they could not be substantiated. As a result, we em-

phasize that mere allegations are inadequate to overcome the presumption in favor of the affidavit's validity. The defendant must show that the information omitted was material to the determination of probable cause and that it was omitted for the purpose of misleading the magistrate.

Turning to defendant's allegations in this case, we note initially that his position is somewhat paradoxical. On the one hand, he concedes that a large investigative file had to be condensed for the purpose of preparing the search warrant affidavits, and that the police were not required to set forth all the information they had accumulated. Yet, were the authorities to include all the facts which defendant alleges were necessary to a probable-cause determination, they would have had to include virtually every piece of information relating to the investigations of the four armed robberies and six homicides. Clearly, such a requirement would be impractical and unreasonable given that search warrant affidavits "are normally drafted *** in the midst and haste of a criminal investigation." *United States v. Ventresca* (1965), 380 U.S. 102, 108, 13 L. Ed. 2d 684, 689, 85 S. Ct. 741, 746.

Defendant relies heavily on the statements given to the police by the Kundes and Satnesses. He argues that the affidavit failed to mention that the Satnesses observed a maroon Ford station wagon parked in front of Fredd's Groceries around the time of the murders.

This description, defendant contends, was not inconsistent with the one furnished by Jarrett. Although it is not entirely clear, defendant's position appears to be that the person responsible for the crimes could have been driving a maroon station wagon, but that reference to this vehicle was intentionally omitted from the affidavit in order to tailor the facts to focus on him. Defendant further points out, in an apparent attempt to link the station wagon allegedly observed by the Satnesses to one of the other murder scenes, that the affidavit failed to include the sighting of a

station wagon at the E-Z Go gas station.

It would unduly prolong this opinion to set forth in detail the information supplied to the police by the Kundes and Satnesses. Instead, we simply note that the evidence shows their statements were so fraught with inconsistencies that it was not unreasonable for the police to conclude that the information was unreliable. Moreover, even if we were to assume that the Satnesses had, in fact, seen a maroon station wagon, there is nothing to connect that vehicle, as defendant suggests, to the E-Z Go murder. The police reports pertaining to the E-Z Go homicide investigation reveal that the station wagon observed there was dark blue. (The only other reference to a station wagon at that location was to one owned by the victim.) Under these circumstances, it can hardly be said that this information should have been included in the affidavit or that it could have affected the magistrate's determination of probable cause.

Defendant also alleges that the authorities deliberately omitted contradictory descriptions of cars and suspects observed at the four crime scenes. We have reviewed the police reports submitted by defendant to support his claim and conclude that his argument is unfounded. For the sake of brevity, we will deal with only one example cited by defendant.

He asserts that the affidavit omitted reports of brown automobiles observed at three of the crimes scenes. According to defendant, "[t]he frequency of the reports regarding a brown car would be more probative, because common to a number of locations, than the maroon car described by Jarrett." This necessarily assumes, and defendant implies, that the same brown car was observed at all three locations. An examination of the police reports reveals such is not the case. One of the automobiles, described as a chocolate-brown 1968 Buick, was observed, not at Fredd's Groceries, but at a liquor store a block and

a half away more than an hour after the murders. The second vehicle, described simply as medium brown, was reportedly seen at the E-Z Go gas station. Lastly, at the Clark gas station, a witness reported seeing a white-over-brown Chrysler. Thus, there is no merit to defendant's assertion that these sightings were more probative than the vehicle described by Jarrett and therefore should have been included in the affidavit.

Defendant also complains that the affidavit failed to mention the information provided by Jessie Fleming, who claimed to have seen three armed men emerge from Fredd's Groceries minutes before the bodies were discovered. Defendant further notes that Fleming received a "qualified yes" after submitting to a polygraph test. That the police had reason to discount Fleming's information is readily evident after examining the police reports. True, Fleming originally stated that, as he was walking towards Fredd's store, he heard two shots and saw three black males emerge from the store and enter a 1969 cream-colored four-door Chrysler Newport. Fleming stated that two of the men wore mid-length green army coats, the third a long brown coat. During a subsequent interview, however, Fleming's story changed considerably; he stated he saw one black male, wearing a black leather coat, emerge from the store and enter a black or medium blue Buick Electra two-door, allegedly occupied by two other men. He also admitted to fabricating the description of the Chrysler. As to the polygraph test, defendant conveniently neglects to reveal that the police wanted to conduct a second test as Fleming admitted to having had very little sleep and to having smoked marijuana prior to the first test. To argue that Fleming's information should have been included in the affidavit, and that its omission evinces a calculated effort to deceive the magistrate, borders, we think, on the absurd. To so hold would impose upon the police the duty to present to a magistrate every conceivable piece of infor-

mation, regardless of its reliability, obtained during the course of their investigation. *Franks v. Delaware* clearly does not require such a result.

The most "glaring omission" defendant argues concerns a pair of paint-stained boots. The search warrant authorized a search for a pair of men's boots based on information in the affidavits that a footprint was left in wet paint at the scene of the E-Z Go homicide. Defendant alleges that the authorities deliberately omitted the fact that a pair of boots, similar to the ones sought, had been recovered from another suspect. He contends that the prosecution must present evidence to rebut "the obvious inference that this fact was deliberately hidden from the magistrate."

The error in defendant's argument is that a mere assertion does not give rise to an inference of improper conduct; defendant must establish that the omission was intentional and for the purpose of deceiving the magistrate. (*United States v. Mankani* (2d Cir. 1984), 738 F.2d 538, 546; *People v. Kurland* (1980), 28 Cal. 3d 376, 390-91, 618 P.2d 213, 222, 168 Cal. Rptr. 667, 676.) The record, however, contains no such evidence.

Moreover, had the information concerning the boots been included in the affidavit, it certainly would not have negated the existence of probable cause. The police report shows only that the boots recovered from the suspect had the same type pattern as a print found at the E-Z Go station but that "further examination and followup" were required. Defendant introduced no evidence regarding the subsequent examination, or indeed if any further investigation was ever conducted.

In addition, it must be remembered that ballistics tests had determined that the four armed robberies and six homicides were related. The police, therefore, were searching for a person common to all four crime scenes. Since there is nothing in the record that even remotely ties the other suspect to any of the other crime scenes, we cannot

say that the magistrate would have found probable cause to be lacking.

Defendant also complains that the affidavit failed to mention that Fredd had filed a police report the day before he was killed wherein he named three men who may have been responsible for burglarizing his store some weeks earlier. According to the officer who prepared the report, Fredd was "very upset" and indicated "somebody was going to get shot (himself, somebody else, or both)." Defendant maintains that this fact was intentionally omitted in a calculated effort to mislead the magistrate. Again, however, there is no evidence to support his claim, and, as we noted earlier, we will not infer improper conduct on the basis of a mere assertion. See *United States v. Mankani* (2d Cir. 1984), 738 F.2d 538, 545-46; *People v. Townsend* (1980), 90 Ill. App. 3d 1089, 1096.

Defendant next contends that since the search warrant affidavits contained intentional misstatements, the warrants must be quashed pursuant to Illinois law even if the misstatements were not necessary to a probable-cause determination. Because we have concluded that there were no intentional misstatements, it is unnecessary to address this question.

Defendant next challenges the facial validity of the search warrant affidavits, contending there was insufficient factual information to establish probable cause. At the suppression hearing, defendant conducted what can best be described as major surgery. Playing the role of a surgeon, he placed the affidavits on the table, sharpened his scalpel, and began cutting, extracting virtually every phrase or sentence. As each was removed, it was placed under a microscope, diagnosed by him as conclusory or vague, and discarded. As one would expect, when the surgery ended, little remained of the patient, save for a pile of incohesive fragments.

Defendant has utilized the same procedure here. He has

excised what he asserts are merely conclusions or exceedingly vague terms and argues that the remaining material is insufficient to establish probable cause. There is, admittedly, a degree of validity to defendant's argument. When certain statements are extracted and viewed independently, one can reasonably argue that they lack sufficient supporting facts. Yet, the Supreme Court, in *Massachusetts v. Upton* (1984), 466 U.S. ____, ____, 80 L. Ed. 2d 721, 727, 104 S. Ct. 2085, 2088, recently criticized the practice of "judging bits and pieces of information in isolation ***." Affidavits are to be construed in their entirety (466 U.S. ____, ____, 80 L. Ed. 2d 721, 727, 104 S. Ct. 2085, 2088), in a "commonsense and realistic fashion" (*United States v. Ventresca* (1965), 380 U.S. 102, 108, 13 L. Ed. 2d 684, 689, 85 S. Ct. 741, 746). Also, a reviewing court must not substitute its judgment for that of the magistrate; in construing an affidavit, the reviewing court must "merely [decide] whether the evidence viewed as a whole provided a 'substantial basis' for the magistrate's finding of probable cause." (*Massachusetts v. Upton* (1984), 466 U.S. ____, ____, 80 L. Ed. 2d 721, 727, 104 S. Ct. 2085, 2088.) Finally, deference is to be accorded the magistrate's decision to issue the warrant. *Massachusetts v. Upton* (1984), 466 U.S. ____, ____, 80 L. Ed. 2d 721, 727, 104 S. Ct. 2085, 2088; *Jones v. United States* (1960), 362 U.S. 257, 270-71; 4 L. Ed. 2d 697, 708, 80 S. Ct. 725, 735-36.

Applying these principles to the affidavits here, we conclude that the search warrants were properly issued. While it is true that "[n]o single piece of evidence *** [was] conclusive *** the pieces fit neatly together and, so viewed, support the magistrate's determination" of probable cause. *Massachusetts v. Upton* (1984), 466 U.S. ____, ____, 80 L. Ed. 2d 721, 727, 104 S. Ct. 2085, 2088.

Defendant next contends a Federal search warrant can only issue if there is probable cause to believe a Federal offense has been committed and evidence of *that* crime is lo-

cated in the place to be searched. He maintains that because the search warrants obtained by FBI agents Phillips and Brerton authorized a search for evidence unrelated to the Federal charge for which he was arrested, the search warrants were invalid. The defendant also contends that the search warrants were invalid because 18 U.S.C. section 1073 (1982) required the officers to receive prior written approval from the Attorney General or one of his assistants before seeking the warrants. (Contra, Fed. R. Crim. P. 41.) Since defendant did not object to the search warrants on these grounds at the suppression hearing, at trial, or in his post-trial motion for a new trial, the issue is waived. *People v. Caballero* (1984), 102 Ill. 2d 23; *People v. Huckstead* (1982), 91 Ill. 2d 536; *People v. Lykins* (1979), 77 Ill. 2d 35.

Defendant next contends that the U-Haul trailer was illegally seized and the evidence recovered from it should have been suppressed despite the validity of the subsequent search. As noted at the beginning of this opinion, Agent Bogaty, the day after defendant's arrest, went to the home of Charlie Benton, defendant's uncle. There Bogaty observed the U-Haul, now 16 days overdue, parked in Benton's yard. Following a discussion with Benton, Bogaty had the trailer removed to the Greensboro police department, where it was searched the next day pursuant to a search warrant.

At the suppression hearing, defendant challenged a statement in the Brerton search warrant affidavit which said "Benton authorized FBI agents to secure trailer and tow it in ***." The trial court permitted defendant to call Benton and Bogaty for the purpose of showing that Benton did not consent to the removal of the trailer. After hearing the testimony, the court ruled that the trailer was lawfully seized, although the parties disagree as to the basis of the court's decision. The State contends the court found Benton had consented to the removal of the trailer.

Defendant, on the other hand, argues the court justified the seizure, not on the basis of consent, but on two alternative grounds which he asserts were erroneous. In support, defendant, quoting in part from the transcript of the suppression hearing, alleges "the court explicitly found that Benton 'was not specifically asked for his consent to remove the property, the trailer.' " He also argues that had the court found consent, there would have been no need to discuss the alternative grounds.

The trial judge began his ruling with a discussion of the bailor/bailee relationship which existed between Benton and defendant. He then stated:

"[Benton], the property owner, real estate owner, had received no fee for its storage, gave no evidence of having any obligation to protect the property, advised the authorities of no such obligations; and while it is true that he was not specifically asked for his consent to remove the property, the trailer, *it must be considered what inferences could be drawn from the conversation that did take place,* according to what he, the property owner, remembered and what [Bogaty] remembered.

And it must further be considered that it is not alleged that he gave consent to enter or examine the contents of that trailer, but simply that it be removed from his premises. \*\*\*" (Emphasis added.)

Then, after discussing alternative grounds for the trailer's seizure, the propriety of which we need not address, the judge stated:

"I have considered fully these questions raised relative to the consent features of the affidavits upon which the magistrates made their decisions to issue warrants in these cases, and find that the warrant in each case was properly issued under the circumstances."

Given these statements, we think it is reasonable to conclude that the trial court did, in fact, find that Benton had consented to the removal of the trailer. This is especially true when one considers that the consent issue arose

as the result of defendant's charge that the Brerton affidavit falsely stated that Benton had "authorized" agents to tow the trailer away. Since the court concluded that the search warrants had been "properly issued," it necessarily follows that the court found that Benton had indeed consented. The trial court, therefore, properly admitted the evidence recovered from the U-Haul.

The defendant further alleges that the trial court erred by failing to suppress items not listed in the search warrant which were seized during the warranted search of defendant's automobile. The items seized consisted of towing receipts, a Rockford newspaper, a U-Haul Rental Contract, and a manila envelope containing personal papers, including an airline ticket receipt for a flight from Greensboro to Chicago on January 22, 1981, and a Greensboro bus schedule.

At the suppression hearing the State argued that the items were properly seized under the plain-view doctrine. The defendant argued that the plain-view doctrine was inapplicable because the items were not apparent evidence of any crime. We agree with the trial court that the evidence was properly seized.

Under the plain-view doctrine an officer executing a valid search warrant may seize items not listed in the warrant if such items are of an apparently incriminating nature. (*Coolidge v. New Hampshire* (1971) 403 U.S. 443, 466, 29 L. Ed. 2d 564, 583, 91 S. Ct. 2022, 2038; *United States v. Jefferson* (7th Cir. 1983) 714 F.2d 689, 694; see *People v. Gacy* (1984), 103 Ill. 2d 1, 25-26.) At the time of his arrest the defendant in the present case told the officers that he had not been in the Rockford area for the past two months, which included the date of the murders. The items seized tend to contradict this statement and circumstantially placed the defendant in the Rockford area at the time of the murders. Thus, the evidence seized was apparent to the officers as being of an incriminating nature, and

it was not error for the trial court to deny the motion to suppress.

The defendant raises for the first time the issue of whether the items contained in the manila envelope were actually in plain view. Since this argument was not raised in the motion to suppress, the hearing thereon, or at any other time prior to this appeal, we find the issue is waived. *People v. Caballero* (1984), 102 Ill. 2d 23; *People v. Nilsson* (1970), 44 Ill. 2d 244.

Defendant next argues that he is entitled to a new trial because the trial court erred by limiting the testimony of a police officer concerning the showing of a photographic lineup to two witnesses. The two witnesses had reported seeing something suspicious in the general vicinity of Fredd's Groceries an hour after the murders. In light of the testimony given by the witnesses, we do not believe the trial court erred by limiting the officer's testimony.

The two witnesses, Ebenezer Joseph and Robert Bell, were called by the defendant at trial. They testified that, about an hour after the murders, they were at a liquor store located about a block and a half from Fredd's Groceries. They stated that, while at the liquor store, they observed a car pull up containing two subjects who "seemed nervous." The subject on the passenger side left the car, entered the liquor store carrying a bag, purchased a pack of gum, and then returned to the car. Bell and Joseph testified that the car then left at a fast rate of speed—"faster than a normal car would take off."

Joseph and Bell testified that they reported their observations to the police and were shown a photographic lineup. Joseph testified that he never saw the driver's face and that from the lineup "there were two we thought we recognized not for sure. I can't say for sure." Bell testified that there was one picture which "looked like the guy that came in the store, and it did, only it looked smaller, it like— like might have been him when he was a little youn-

ger or thinner." Neither Bell nor Joseph knew the name of any of the individuals shown in the lineup.

Pursuant to the granting of the State's motion *in limine*, the testimony of the officer who showed the witnesses the photographic lineup was limited to identifying the pictures which were used. The officer could not have testified as to any positive identification made by the witnesses because the witnesses had already testified that they were not able to positively identify either of the subjects from the store in the lineup. To have allowed the officers to testify as to a positive identification would have been to allow the defendant to impeach his own witnesses which was not proper at the time except upon a showing of surprise. (73 Ill. 2d Rules 238, 433.) Rules 238 and 433 were amended effective April 1, 1982 (87 Ill. 2d Rules 238, 433), which is subsequent to the trial of this case.

The defendant argues that the officer should have been allowed to testify as to the names of the subjects portrayed in the lineup. The trial court disallowed such evidence on the grounds that it was not relevant to any issue of consequence at trial. We do not find that ruling to be in error.

"Relevant evidence" has been defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (Fed. R. Evid. 401; *People v. Free* (1983), 94 Ill. 2d 378, 413; *People v. Monroe* (1977), 66 Ill. 2d 317, 322.) In the present case the defendant claims that the names of the individuals portrayed in the photographic lineup are relevant. Neither Bell nor Joseph could positively identify anyone in the photograph as being the individuals they saw at the liquor store. All that the officer's testimony would have done would be to give a name to a picture of someone who may have resembled someone, other than the defendant, who looked nervous in a liquor store a block and a half away from the murder scene an hour after the

murders. This was not relevant evidence. It was not error for the trial court to limit this officer's testimony.

The defendant also argues that the trial court erred by allowing the State to introduce testimony of three witnesses concerning his 1970 arrest for armed robbery. The trial court entered a pretrial order prohibiting the State from using the 1970 arrest for impeachment purposes. At trial the State was allowed to introduce some evidence of the 1970 arrest through the testimony of Victoria Cobb (defendant's former girlfriend), the circuit clerk of Winnebago County, and Officer Loyal Slaughter (the arresting officer in 1970). The trial court allowed the testimony on the grounds that it tended to show motive but prohibited the mention of the specific crime for which defendant was arrested.

Victoria Cobb testified that, in the spring of 1977, defendant mentioned to her that "he had been in trouble and he had run into Fredd's and Fredd let the police know he was there." Cobb also testified that, on the first Sunday of December 1980, the defendant requested her to look up the number of Fredd's Groceries. She stated that the defendant then called Fredd's Groceries and asked "What time do you close?"

The circuit clerk of Winnebago County testified that on January 5, 1971, the Winnebago County grand jury returned a true bill of indictment against the defendant. The clerk further testified that the second witness listed on the back of the true bill was Willie Fredd.

Officer Loyal Slaughter testified that on December 18, 1970, while investigating a crime, he met with Willie Fredd and went to Fredd's place of business. Slaughter testified that Fredd went to the door and called inside. The defendant then came out and was taken into custody. Slaughter further testified that, while leading the defendant away, the defendant turned and said something to Fredd.

Evidence of other crimes, while not admissible to show the propensity to commit crime, is admissible to show motive. (*People v. Foster* (1979), 76 Ill. 2d 365, 374; *People v. Prohaska* (1956), 8 Ill. 2d 579, 589.) Defendant argues that the testimony introduced was not sufficiently probative of an intent to kill and thus the trial court erred in admitting it. Generally, while any evidence which tends to show that an accused had a motive for killing the deceased is relevant, such evidence, to be competent, must at least to a slight degree tend to establish the existence of the motive relied on. (*People v. Branion* (1970), 47 Ill. 2d 70, 77; *People v. Gougas* (1951), 410 Ill. 235, 238-39.) The testimony in the present case shows that Fredd turned the defendant over to the police in 1970, that at that time the defendant said something to Fredd, that the defendant, with Fredd's testimony, was later indicted by the grand jury for the crime, that seven years later the defendant was still mentioning the fact that he had been in trouble and that it was Fredd who had turned him in and that, approximately a month and a half before the murder of Fredd, the defendant called Fredd's Groceries inquiring about the hours. This evidence tends to show the existence of a continued awareness by the defendant of his grievance against Fredd and is relevant to establish motive.

Defendant also alleges that Victoria Cobb's testimony concerning his 1980 phone call to Fredd's Groceries and his 1977 statements about Fredd turning him over to the police was inadmissible because it constituted irrelevant hearsay. In reference to the 1980 phone call, Cobb was asked, "Do you recall what he said?" She answered, "What time do you close?" The defendant did not object to the question, nor did he ask that the answer be stricken from the record. Defendant's objection to the alleged hearsay cannot be raised for the first time on review; having failed to object at trial, the issue is waived. *People v. Lane* (1963), 29 Ill. 2d 326, 331; *People v. Sinclair* (1963), 27 Ill.

2d 505, 507-08.

The defendant did object to Cobb's testimony concerning what the defendant told her in 1977 about Fredd turning him over to the police. The trial court overruled the objection and allowed the testimony. We believe the trial court's ruling was proper.

The defendant's statement, as retold by Cobb, constitutes an admission. An admission is a statement or conduct from which guilt may be inferred, when taken in connection with other facts, but from which guilt does not necessarily follow. (*People v. Stanton* (1959), 16 Ill. 2d 459, 466; *People v. Griswold* (1950), 405 Ill. 533, 541.) As discussed above, the defendant's statement concerning Fredd turning him over to the police was relevant to show motive, and the jury could have inferred guilt when that statement was taken in connection with all the other evidence. The statement was an admission and therefore not objectionable under the rule against hearsay. *People v. Simpson* (1977), 68 Ill. 2d 276, 282; *People v. Newbury* (1972), 53 Ill. 2d 228, 234.

The two maids referred to earlier who were employed by the Westward Motel in Rockford testified that, while cleaning the defendant's room following his departure, they found a laundry receipt. On the receipt the word "Stewart" was written. The receipt was admitted into evidence. The defendant contended at trial and argues now that the testimony concerning the receipt and the receipt itself were inadmissible as hearsay evidence.

We do not consider the cases cited by the defendant applicable. In those cases the documents were offered to establish the truth of the matters asserted on the document. (See *Plepel v. Nied* (1982), 106 Ill. App. 3d 282; *Society of Mount Carmel v. Fox* (1980), 90 Ill. App. 3d 537; *Harris v. Collins* (1979), 149 Ga. App. 638, 255 S.E.2d 107.) In our case the laundry receipt was not offered to prove that Stewart had his clothes cleaned at the particular laundry. This

laundry receipt tended to link Stewart with room 22 of the Westward Motel and was but one link in a chain of investigative evidence which, in turn, linked Stewart with a maroon automobile with a black top and with the murder of the two individuals at Fredd's grocery store. It is thus circumstantial evidence which, as stated in Wigmore's treatise on evidence, is not objectionable hearsay. (6 Wigmore, *Evidence* sec. 1788 (Chadbourn rev. ed. 1976).) In *United States v. Canieso* (2d Cir. 1972), 470 F.2d 1224, 1232, a letter found in the possession of a third person was admitted into evidence against the defendant not to prove the truth of the content of that letter but to show the resemblance of that letter to a letter found on the defendant's person, thus circumstantially giving rise to the inference that the defendant was connected with the person who possessed the letter offered in evidence. In *United States v. Mejias* (2d Cir. 1977), 552 F.2d 435, a hotel receipt and a luggage invoice were introduced into evidence. The court held these documents were not hearsay evidence because they were not offered to prove the truth of their content; that is, the payment of the hotel bill or the purchase of a piece of luggage by the defendant, but were circumstantial evidence of the defendant's connection with the hotel and the luggage that had been seized at the hotel. In *United States v. Mazyak* (5th Cir. 1981), 650 F.2d 788, 792, a letter was introduced into evidence. The court held that the letter was offered for the purpose of linking the appellants to one another and to a ship, and not to prove the matter asserted in the letter, and was therefore not hearsay.

In our case the defendant had been identified in court as the person who occupied room 22 at the motel under the assumed name of Alan Spaulding by one of the maids and by the manager of the motel before any evidence concerning the laundry receipt was offered. As the State now argues, the receipt was offered to explain the subsequent actions of the authorities in focusing the investigation on

an individual named Raymond Stewart. The above authority indicates that the evidence was properly admitted.

Defendant also argues the chain of possession of the receipt had not been adequately established and that the evidence did not show that it was the same receipt that was found in room 22. One of the maids did testify that she did not think the receipt was the same receipt that had been found. There was some discussion between counsel and the witnesses that indicated that some chemical testing had been performed and there was some reference to a change in color of at least part of the receipt. No evidence was offered as to the nature of the testing or who performed it. However, the receipt was positively identified by one of the maids as being the one found in room 22 and in the same condition as the receipt when found with the exception of some change in the color. Therefore, it was not necessary to establish a chain of possession of this exhibit. (*People v. Graves* (1982), 107 Ill. App. 3d 449, 454.) A foundation for the admission of the physical evidence may be made through its identification by witnesses or through a chain of possession. It is unnecessary to require both identification and the establishment of a chain of possession. (*People v. Hagen* (1978), 63 Ill. App. 3d 944, 948; *People v. Pagliara* (1977), 47 Ill. App. 3d 708, 714.) We find no error in the admission of the laundry receipt.

During the trial, the defendant presented to the court a motion *in limine* seeking the exclusion of all evidence of the armed robbery of Cornelius Jones on December 7, 1980, in South Beloit, Illinois, which we referred to earlier. The court denied the motion. Jones testified that on December 7, 1980, he was robbed by an armed man in a parking lot of Georgie's Lounge in South Beloit. Taken from him at that time was a shoulder bag containing a .38-caliber Smith & Wesson revolver, a Polaroid camera, a Honeywell strobe unit, and a drycell battery pack. These items were recovered as a result of a search of the defend-

ant's possessions in Greensboro, North Carolina. Also recovered in the search was a blue-steel .38-caliber snub-nose R&G Industries revolver. At the trial, Jones identified the camera and accessories, and the .38-caliber Smith & Wesson revolver as the items that had been taken from him in the robbery on December 7, 1980. He also identified the .38-caliber R&G revolver as similar in appearance to that used by the robber on that occasion. Jones had not seen the robber's face, but he did see the car in which he drove away. He identified a photograph of the defendant's Buick Electra as the car. Firearm identification evidence conclusively established that the S&W revolver taken from Jones in the robbery was the weapon from which the bullets that killed Fredd and Pearson were fired.

The trial court, in its ruling on the motion *in limine*, held that Jones' testimony as to the loss of his S&W revolver proved that the true owner of the gun was not involved in the murders and that the circumstances of the armed robbery, including the taking of the camera equipment later found with defendant's possessions in Greensboro, North Carolina, were probative of the fact that it was the defendant who robbed Jones and took possession of the murder weapon and not someone else. The court found that the probative value of this evidence outweighed its prejudicial effect.

Defendant contends that the evidence of this other crime should not have been admitted and that, if it could be used, the prosecution should not have used such evidence in its case in chief. If used at all, defendant argues, it should have been introduced during the State's rebuttal. The evidence offered does not fall within the general prohibition against introducing evidence of other crimes. Such evidence is inadmissible if relevant merely to establish defendant's propensity to commit crime. (*People v. Lindgren* (1980), 79 Ill. 2d 129.) In *People v. McKibbens* (1983), 96 Ill. 2d 176, 185-87, this court reviewed the law in this

State on the question of admissibility of evidence of other crimes. In that case, although we held the evidence of other crimes admissible, we advised against such detailed evidence of the other crime as was given there. We do not find the same detailed evidence present in this case concerning the robbery of Jones.

As noted above, the testimony of Jones concerning his robbery was relevant to connect the defendant to the murder weapon and to explain his possession of it. Also, Jones' testimony concerning the robber fleeing in a Buick Electra identified as looking like the automobile that defendant owned was similarly relevant. The facts which this evidence tended to establish were properly proved during the State's case in chief and not in the State's rebuttal. The evidence offered, although it disclosed the commission of another crime by defendant, did not simply establish the defendant's propensity to commit crime. Instead, it was relevant to some very material elements of the crimes involved in this case and was properly admitted.

We discussed earlier in this opinion the admissibility of evidence of other crimes. However, because of the context in which the question is now raised, further discussion is appropriate. We have noted that the general rule is that evidence of other crimes is not admissible if it is relevant merely to establish the defendant's propensity to commit crime. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182; *People v. Tiller* (1982), 94 Ill. 2d 303, 317.) The exceptions to that general rule, however, are usually stated as falling into specific categories, leaving the impression that if the evidence is not relevant to establish one of the specific exceptions, it is not admissible. For instance, such evidence is said to be admissible if it is relevant to prove *modus operandi*, intent, identity, motive or absence of mistake. See *People v. McKibbins* (1983), 96 Ill. 2d 176, 182; *People v. Dewey* (1969), 42 Ill. 2d 148, 157.

The enumeration of these exceptions should not be

taken to mean that these are the only purposes for which testimony of other crimes may be admitted. Considerable difficulty arises when counsel attempts to fit the facts of the case into these specific exceptions. This court has held that evidence of other crimes committed by defendant may be admitted if relevant to establish any material question other than the propensity of the defendant to commit a crime. *People v. McKibbins* (1983), 96 Ill. 2d 176, 182; *People v. Baptist* (1979), 76 Ill. 2d 19, 27; *People v. McDonald* (1975), 62 Ill. 2d 448, 455; *People v. Dewey* (1969), 42 Ill. 2d 148, 157.

The confusion seems to have arisen from language such as that used by this court in *People v. Lehman* (1955), 5 Ill. 2d 337, 342-43, where this court stated:

> "[A]s a matter of policy, where the testimony has no value beyond [the inference that the defendant is likely to commit a crime], it is excluded. But where the evidence is independently relevant it is admissible as, for example, where it shows motive or intent, identity, absence of mistake or accident, or the existence of a common scheme or design."

This listing of the categories was only used for the purpose of giving examples of the exception to the general rule, as is clearly evidenced by the general context of the language quoted. The stating of the specific purposes for which evidence of other crimes may be admitted is helpful in understanding the nature of the exception, but the language should not be considered as exclusive. Evidence of other crimes is admissible if it is relevant to establish any fact material to the prosecution. (2 Wigmore, *Evidence* sec. 305, at 253 n.2, sec. 306, at 255, n.1 (Chadbourn rev. ed. 1979).) When such evidence is offered, it is incumbent upon the trial judge to weigh the relevance of the evidence to establish the purpose for which it is offered against the prejudicial effect the introduction of such evidence may have upon the defendant. The trial court in our case did

this. We find that his ruling on the motion *in limine* and his admission of the evidence were proper.

The defendant next argues that the court erred in allowing a witness to relate a statement which the defendant had made to her but which had not been disclosed to the defendant during discovery. During direct examination by the prosecutor, Waunita Williamson testified that on December 12, 1980, the defendant had told her that he "had some guns." The defendant contends that the State's failure to disclose this statement to the defendant constitutes a violation of Supreme Court Rule 412(a)(ii) (87 Ill. 2d R. 412(a)(ii)). The defendant contends that he was prejudiced by this evidence and that the trial court's failure to exclude it was an abuse of discretion. He argues that his conviction should be reversed and a new trial granted.

It is important to note what actually occurred at trial. During direct examination of Williamson, after fixing the time and place and establishing who was present, the prosecutor asked the witness what the defendant said to her at that time. Defense counsel objected and asked to be heard in chambers. In chambers the court asked the prosecutor what he sought to elicit by this question. The prosecutor said that he expected the witness would testify that the defendant had stated that he had more than one gun and that he was leaving the area. The defense counsel said he had never heard anything about the defendant telling the witness about having a gun. The court then asked if the name of this witness had been given to the defendant. Defense counsel said that he had been given her name in several reports concerning statements. The prosecutor said he did not think that the statement concerning the defendant saying he had some guns had been given to the defendant because he had just learned of this statement about three weeks earlier. When the judge asked the defense counsel for a response, counsel said he had known about the witness for a long time. His expectation was that the witness'

response to the question asked by the prosecutor in court and to which he had objected was that she would say the defendant told her "I am on the run." Defense counsel said that this statement had been made in regard to another case in which the defendant was involved. Defense counsel said that he did not see any relevance of that statement to the present case and that the statement "I'm on the run" had a great deal of potential for prejudice. The prosecutor then said he did not intend to elicit from this witness that the defendant had said "I'm on the run." He was attempting to elicit only the statement concerning the fact that the defendant had a number of guns. The court then said, "We'll proceed."

Although the defendant now contends he was prejudiced by the failure of the prosecutor to furnish him with a statement that the defendant made concerning having a gun, that was not the basis of his objection in the trial court. When he asked for a conference in chambers he only wanted to forestall the answer he expected the witness to make: "I'm on the run." When he learned that she was going to say that the defendant had a gun or guns, defense counsel, although he stated he had never been furnished such a statement, never objected to such testimony. He also did not asked for a continuance, nor did he ask to interview the witness concerning this statement. His only objection was to the relevance and prejudicial effect of the defendant's statement to this witness, "I'm on the run." When the prosecutor said that he was not going to elicit that statement, but only the statement about the guns, defense counsel did not object nor did he object when the court said, "We'll proceed."

Defendant relies on *People v. Weaver* (1982), 92 Ill. 2d 545, in support of his position that his conviction should be reversed and a new trial granted. In *Weaver* the prosecution called a witness who testified to a statement made by the defendant. The statement was an admission by the

defendant relevant to a motive for the murder. The prosecutor had failed to inform defense counsel of this statement. As soon as the witness testified concerning this statement, defense counsel moved to strike the testimony or that a mistrial be granted. The court denied these motions. In *Weaver*, the witness had testified before defense counsel had an opportunity to object. The trial court refused to eliminate the prejudicial effect of the testimony.

*Weaver* is not helpful in our case. Here the witness did not testify as to the statement before defense counsel had an opportunity to object. During the conference in chambers, defense counsel never objected to the testimony concerning the undisclosed statement. Although the defense counsel learned of the content of this undisclosed statement during the conference in chambers before the witness testified, no effort was made by defense counsel to prevent such testimony, nor was the court asked to do so. The defendant cannot now contend such testimony was prejudicial. See *People v. Foster* (1979), 76 Ill. 2d 365.

In *People v. Greer* (1980), 79 Ill. 2d 103, this court stated:

> "The defendant was clearly entitled to the substance of this oral statement, and a list of the witnesses to it [citations], but failure to provide them does not in all instances necessitate a new trial. Noncompliance with discovery requirements does not require reversal absent a showing of prejudice." (*People v. Greer* (1980), 79 Ill. 2d 103, 119-20.)

In view of the defense counsel's failure to object to the testimony concerning this undisclosed statement in the trial court, and his failure to give the trial court an opportunity to prevent testimony concerning this statement, it cannot now be contended that the witness' testimony concerning the statement was so prejudicial to the defendant that his conviction must be reversed and a new trial granted.

It is defendant's position that the circumstantial evi-

dence was insufficient to prove him guilty beyond a reasonable doubt. He argues that the State must establish the defendant's guilt so thoroughly as to exclude every reasonable hypothesis of innocence, citing *People v. Garrett* (1975), 62 Ill. 2d 151. As a hypothesis of innocence, which the defendant contends was not excluded by the evidence, he asserts that, under the evidence presented, it is possible that the murders were committed by someone else and that the defendant obtained possession of the murder weapon between the date of the crimes and the time that he left Rockford for Greensboro, North Carolina. This hypothesis, however, cannot stand in light of the fact that not only was the murder weapon found in the defendant's possession, but the camera, the power pack, and other items that had been taken from Cornelius Jones by a robber at the same time that the murder weapon was stolen were also found in his possession in Greensboro, North Carolina. Also, Jones identified the defendant's Buick Electra as the car in which the robber fled.

The defendant also argues the question of credibility of the testimony of some of the State's witnesses. It is the function of the jury to determine credibility of the witnesses. (*People v. Akis* (1976), 63 Ill. 2d 296, 298.) In circumstantial evidence cases, the jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances necessary to establish the guilt. It is sufficient that all of the evidence, taken together, satisfies the jury beyond a reasonable doubt of the defendant's guilt. (*People v. Foster* (1979), 76 Ill. 2d 365, 373-74.) It is for the trier of fact to determine the weight and sufficiency of the evidence, and that determination will not be reversed unless the evidence is so improbable as to create a reasonable doubt of the defendant's guilt. (*People v. Davis* (1983), 95 Ill. 2d 1, 27.) We find no merit in the defendant's claim that the circumstantial evidence was insufficient to prove his guilt beyond a reasonable doubt.

The defendant next argues that qualifying prospective jurors pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, results in a jury biased in favor of the prosecution. The defendant recognizes that this court has rejected this contention in *People v. Free* (1983), 94 Ill. 2d 378, and in *People v. Carlson* (1980), 79 Ill. 2d 564, but requests this court to reconsider the holding in those cases. The defendant has suggested no reason for such a reconsideration. We therefore decline to do so.

The defendant complains that he was improperly precluded from presenting mitigating evidence and is therefore entitled to a new sentencing hearing. Three witnesses, two of the defendant's sisters and a friend of the defendant's family, were asked questions about their attitude toward the death penalty and if they wanted to see the defendant put to death. These witnesses were permitted to give evidence as to the defendant's background and to testify as to his character. The evidence precluded concerned the ultimate conclusion to be reached by the jury; that is, whether the defendant should be sentenced to death. This is the type of evidence of which it has been stated: "There is no necessity for this kind of evidence," and "it is wholly without value to the trier of fact in reaching a decision." McCormick, Evidence sec. 12, at 26-27 (2d ed. 1972).

This court has held that the rules of evidence are relaxed at a sentencing hearing; however, the evidence must be relevant and must be reliable. (*People v. Free* (1983), 94 Ill. 2d 378, 422-23.) We fail to see the relevance of the offered testimony of these witnesses to any question the jury had to decide. Also, whether the sisters of the defendant and a friend of the family thought the defendant should live or die could not be considered reliable testimony. The trial court properly excluded the testimony.

Also at the sentencing hearing the defendant called a Catholic priest, a Unitarian minister, and a United Method-

ist minister. They were not permitted to testify as to their church's position on the objectives of punishment, the deterrent effect of the death penalty, and the church's position on the imposition of the death penalty. The defendant acknowledges that the court has considered the rejection of similar testimony in *People v. Williams* (1983), 97 Ill. 2d 252. The defendant attempts to distinguish the holding in *Williams*, urging that here the evidence was offered to give the jury a particular perspective on punishment and the position taken by the three religious organizations on the death penalty. The holding in *Williams* addressed these issues. This court stated:

"Within constitutional limits, the manner of execution is a matter for the legislature. The defendant was given the opportunity to present evidence in mitigation of his offenses, not to offer views on the death penalty statute. Arguments against the death penalty in general and not containing evidence in mitigation are inadmissible." (*People v. Williams* (1983), 97 Ill. 2d 252, 301.)

Under the holding in *Williams*, the court properly sustained the prosecution's objections to the testimony of the three ministers in this case.

At the sentencing hearing the State introduced evidence of the defendant's conduct while in jail awaiting trial. One officer testified that the defendant kicked him in the leg. Another officer testified that the defendant had called several police officers names during a booking procedure. Two officers testified that the defendant had thrown his excrement on the walls of his cell and at one of the jailers. Photographs of the defendant's cell and of the jailer were introduced into evidence. The defendant contends that his conduct in jail was an irrelevant matter and that the jury should not have considered it in determining whether the defendant should be sentenced to death.

This court has held that evidence of misconduct of the defendant that did not result in prosecution or conviction is

admissible at a sentencing hearing. In *People v. La Pointe* (1981), 88 Ill. 2d 482, 494-99, this court thoroughly reviewed the holding on the admissibility of evidence at a sentencing hearing. Under the authorities collected in *La Pointe*, we find that the evidence here under consideration was properly admitted as reflecting on the character of the defendant. See *People v. Free* (1983), 94 Ill. 2d 378, 422.

At the trial, the clerk of the circuit court of Winnebago County testified as to five previous felony convictions of a defendant named Ray Lee Stewart. Defense counsel objected to the testimony "unless there is evidence that we're referring to the same people." The court overruled the objection "subject to being tied up." After the circuit clerk had testified, the State called the victims of four of these crimes, who testified concerning the offenses, all robberies and armed robberies. The defendant now contends he was prejudiced by the testimony of these four witnesses, claiming that their testimony was unnecessary and only cumulative to the testimony that had been given by the circuit clerk.

The evidence was properly admitted. Because of the objection of the defendant to the clerk's testimony, it was incumbent on the State to show that the defendant named Ray Lee Stewart, charged with and convicted of the other felonies, was one and the same person and that the Ray Lee Stewart who was convicted of those offenses was the same person as the defendant in this case. Each of the four witnesses to whose testimony defendant now objects identified the defendant in court as the perpetrator of the earlier offense and then described briefly how the crime was committed.

The defendant admits that evidence that the defendant had committed these offenses is admissible to negate the absence of significant history of prior criminal activity which is a statutory mitigating factor. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(c)(1).) Defendant contends, however, that

this could have been shown by the testimony of the clerk alone. When the trial judge passed on the objection at trial, he observed that, at a sentencing hearing, information concerning the defendant other than the bare facts of the conviction is properly before the court "within reasonable bounds which must be fixed by the court." We agree. The prosecutor pointed out, when the objection was being argued in the trial court, that he had not presented detailed evidence of each crime, nor had he called more than one witness to each offense. He had limited the evidence to a brief description of what happened and had presented only one witness (the victim) to each crime. The trial court properly overruled the defendant's objection to the testimony of these witnesses.

The defendant contends that an instruction which informed the jury of nonstatutory mitigating factors they could properly consider was erroneously refused by the court in this case. The defendant tendered an instruction which instructed the jury that they could take into consideration five nonstatutory mitigating factors: defendant's developmental environment; defendant's behavioral history; defendant's family situation; defendant's mentality; and defendant's age. The court refused to give the instruction listing these factors but gave an instruction listing certain statutory mitigating factors and "any other facts or circumstances that provide reasons for imposing less than the death penalty." This court, in *Stewart I*, considered identical objections and held that it was not error to refuse the giving of instructions similar to that tendered by the defendant in this case when the instruction which was given told the jury that mitigating factors may include any facts or circumstances that provide reasons for imposing less than the death penalty. See also *People v. Free* (1983), 94 Ill. 2d 378, 420-21.

The defendant contends that it was error to instruct the jury that, if the death penalty were not imposed, the

court would sentence the defendant to a term of imprisonment. The defendant points out that section 5—8—1(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat., 1980 Supp., ch. 38, par. 1005—8—1(a)(1)) provides that if a defendant is found guilty of murdering more than one victim, the court shall sentence the defendant to a term of natural life imprisonment. In *People v. Albanese* (1984), 102 Ill. 2d 54, 81, this court held that it was not error for the trial judge to instruct the jury that the alternative to the death penalty was imprisonment without explaining that life imprisonment was the only statutory alternative to the death penalty.

The aggravating factor relied on by the People to establish defendant's eligibility to be sentenced to death was the multiple-murder factor (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3)). The trial court gave the jury Illinois Pattern Jury Instruction (IPI), Criminal No. 7A.03 (2d ed. 1981), which instructs the jury that to find eligibility for the death penalty, it must find that the defendant was convicted of murdering two or more people "so long as the deaths were the result of either an intent to kill more than one person, or of separate premeditated acts." During deliberation, the jury sent a note to the trial court asking for the legal definition of the words "intent" and "premeditated." Over the defendant's objection, the court gave the jury a supplemental instruction defining the words "intent" and "premeditation." The defendant does not challenge the accuracy of the definition of "intent," but he does challenge the correctness of the definition of "premeditation." We will discuss this later. The defendant argues first that the court should not have given a non-IPI instruction defining these terms, citing *People v. Haywood* (1980), 82 Ill. 2d 540. In *Haywood*, the court gave a non-IPI instruction at the State's request defining when voluntary intoxication would be a defense. The court had also given IPI Criminal No. 24.02, which dealt with criminal responsibility of an intoxi-

cated person. This court said that the simple and clear IPI instruction needed no embellishment, explanation or further definition and found that the non-IPI instructions served only to confuse the jury by redefining in ambiguous language that which had been clearly stated in the IPI instruction on the same subject. In our case, the words "intent" and "premeditated" had not been defined in another instruction nor was the additional instruction defining these terms given prior to the time that the jury retired as in *Haywood*. The holding in *Haywood* is inapposite.

Section 9—1(b)(3) of the Criminal Code (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3)) lists as an aggravating factor qualifying one for the death penalty the murder of two or more individuals "so long as the deaths were the result of either an *intent* to kill more than one person or of separate *premeditated* acts." This language was used in the instruction given to the jury in this case. However, as noted, the words "intent" and "premeditated" were not defined. "Intent" is defined in our Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 4—4). As this court observed in *People v. Davis* (1983), 95 Ill. 2d 1, 33, premeditation is not a recognized mental state in our Criminal Code. The language of section 9—1(b)(3) quoted above was added by an amendment to our death penalty statute prior to its passage. In *Davis* we construed the added language as requiring that "the physical act leading to a multiple murder must be accompanied by a culpable mental state as to *each* murder." (Emphasis in original.) *People v. Davis* (1983), 95 Ill. 2d 1, 35.

We do not believe that the jury, when it requested the court to define these terms, was only asking the judge to " 'help [its] understanding of the English language.' " (See *People v. Heflin* (1978), 71 Ill. 2d 525, 545.) These words were intentionally and purposefully inserted in our death penalty statute for the reasons discussed in *Davis*. If the trial court felt that, by granting the request for a definition

of these terms, the jury would be better able to apply the statute, it was proper for him to comply with the request. This is a matter for the trial court's discretion. In *Heflin*, this court held that the trial court did not abuse its discretion in refusing a request from the jury to rephrase a definition of "legal responsibility" contained in the instructions. We likewise hold that the court in this case did not abuse its discretion by granting the request for a definition of these two terms.

The defendant contends that the definition of "premeditation" which the court gave to the jury was incomplete and misleading. The definition which the court gave to the jury defined premeditation as "[a] prior determination to do an act, but such determination need not exist for any particular period before it is carried into effect." This definition is part of a definition of "premeditation" given in Black's Law Dictionary 1062 (5th ed. 1979). In Black's Law Dictionary, at 1343 (4th ed. 1968), there are two definitions of "premeditation." The one that was given by the court to the jury in this case is attributed to *Commonwealth v. Dreher* (1922), 274 Pa. 325, 326, 118 A. 215, 216. We cannot say that the definition given by the court was incomplete simply because it did not give all of the definitions contained in the dictionary. The definition given was an accurate definition adopted by the Supreme Court of Pennsylvania. The other parts of the definition contained in Black's Law Dictionary (5th ed. 1979), although phrased slightly differently from the definition given to the jury, convey essentially the same meaning. Also, the discussion contained in 40 Am. Jur. 2d, *Homicide* section 52 (1968), reveals that the definition of premeditation given to the jury conforms generally with the meaning of that term in the jurisdictions discussed in the text of section 52. We find no error in the giving of the instruction defining premeditation.

The defendant argues that the sentence of death must

be vacated because the State exercised its peremptory challenges to exclude every juror who expressed general conscientious or religious scruples against capital punishment. In this case, it is contended that the prosecutor not only challenged certain jurors for cause pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, but also peremptorily excused every juror with some degree of reservation regarding the death penalty but who was immune from excusal under *Witherspoon* restrictions. This court considered this argument in *Stewart I*, and rejected it. We see no reason for departing from that holding.

The defendant also contends that the trial court's refusal to permit the defendant to address the sentencing jury denied him his constitutional rights of due process and equal protection. We addressed this issue in *People v. Williams* (1983), 97 Ill. 2d 252, and *People v. Gaines* (1981), 88 Ill. 2d 342, and in those cases we rejected the arguments. The defendant requests us to reconsider our holding in *Williams* and in *Gaines* in light of the holding in *Ashe v. North Carolina* (4th Cir. 1978), 586 F.2d 334, where the court held that it was a denial of due process not to grant the defendant's request to speak prior to the imposition of sentence. The court, in *Ashe*, recognized that the Supreme Court in *Hill v. United States* (1962), 368 U.S. 424, 7 L. Ed. 2d 417, 82 S. Ct. 468, held that the failure of a trial court to ask a defendant represented by an attorney whether he had anything to say before sentence is imposed is not a constitutional error. Federal Rule of Criminal Procedure 32(a) requires a district judge, before imposing sentence, to afford every convicted defendant an opportunity personally to speak in his own behalf. Although this rule was violated in *Hill*, the court held it was not constitutional error. *Hill* was followed in *United States v. Timmreck* (1979), 441 U.S. 780, 60 L. Ed. 2d 634, 99 S. Ct. 2085, and the language holding that the violation of

Federal Rule of Criminal Procedure 32(a) was not of constitutional dimension was quoted. (411 U.S. 780, 783, 60 L. Ed. 634, 638, 99 S. Ct. 2085, 2087.) The *Timmreck* opinion was filed six months after the opinion of the Fourth Circuit in *Ashe v. North Carolina* was filed. We see no reason to depart from the holding of this court in *Williams* and in *Gaines*.

The defendant has attacked the constitutionality of our death penalty statute on several grounds. The defendant first argues that, by permitting the sentencing authority to consider undefined nonstatutory aggravating factors, the Illinois death penalty statute is unconstitutional. This court has recently rejected this argument in *People v. Owens* (1984), 102 Ill. 2d 145, 159, and in *People v. Silagy* (1984), 101 Ill. 2d 147, 161. We adhere to the holding in those cases.

The defendant next contends that the standardless discretion vested in the prosecutor to determine whether to request a death penalty hearing results in the arbitrary and capricious imposition of the death penalty. We adhere to our holding in *People v. Silagy* (1984), 101 Ill. 2d 147, 161, *People v. Davis* (1983), 95 Ill. 2d 1, 22, *People v. Szabo* (1983), 94 Ill. 2d 327, 351, and *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531. In those cases this court held that the grant of discretion to the prosecutor in asking for the death penalty was not constitutionally improper.

The defendant contends that because our death penalty statute fails to provide for adequate comparative review in capital cases, it violates the eighth and fourteenth amendments. This court rejected this contention in *People v. Silagy, People v. Williams* (1983), 97 Ill. 2d 252, 266, and *People v. Kubat* (1983), 94 Ill. 2d 437, 502-04. We adhere to those holdings.

The defendant argues that because the Illinois death penalty statute fails to require the prosecution to prove be-

yond a reasonable doubt that there are no mitigating factors sufficient to preclude the imposition of the death penalty, it is violative of due process. This argument was rejected by this court in *People v. Silagy*, *People v. Garcia* (1983), 97 Ill. 2d 58, 80-81, *People v. Free* (1983), 94 Ill. 2d 378, 421, and *People v. Brownell* (1980), 79 Ill. 2d 508, 534. We similarly reject this contention here.

The defendant lastly contends that our death penalty statute does not require the sentencing authority to make the ultimate determination that death is the appropriate punishment. It is the defendant's contention that our statute requires the sentencing authority to find that there is sufficient mitigation to outweigh the aggravating factors. Such a procedure, defendant argues, establishes a presumption in favor of death. The defendant contends that a jury must be instructed that it must find not only the aggravation in itself is sufficiently substantial to call for the death penalty, and that it outweighs mitigation, but it must further determine that the aggravation, when offset by the mitigation, still establishes an appropriateness of death as a penalty.

The defendant cites a dissent by Justice Stevens on denial of petitions for writ of *certiorari* in *Smith v. North Carolina* (1982), 459 U.S. 1056, 74 L. Ed. 2d 622, 103 S. Ct. 474, which criticized the jury instruction given in a North Carolina capital case. The jury was instructed that it had a *duty* to impose the death penalty if it found: (1) that one or more aggravating circumstances existed; (2) that the aggravating circumstances were sufficiently substantial to call for the death penalty; and (3) that the aggravating circumstances outweighed the mitigating circumstances. Justice Stevens thought there was an ambiguity in the instruction which could lead the jury to believe that it was required to impose the death penalty even though the comparison of the totality of the aggravating factors with the totality of the mitigating factors leaves it in doubt as to

the proper penalty.

We do not see that the instruction given in our case is subject to that criticism. The instruction told the jury it must first unanimously conclude, beyond a reasonable doubt, that the defendant had attained the age of 18 or more, and that a statutory aggravating factor existed as listed in the previous instruction. The jury was then instructed that it *must* consider other factors before coming to a final conclusion concerning whether or not a death penalty should be imposed. It was further instructed that in this stage of its deliberations it *shall* consider any aggravating and mitigating factors which are relevant to the imposition of the death penalty. After discussing the nature of the aggravating and mitigating factors, the instruction informs the jury that if after its deliberation it unanimously determines there is no mitigating factor or factors sufficient to keep the death sentence from being imposed, it should sign the verdict form which so states.

Section 9—1(b) of the Criminal Code (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)) states that a defendant who, at the time of the commission of the offense, has attained the age of 18 or more, and who has been found guilty of murder, *may* be sentenced to death if one of the aggravating factors set forth in the statute is found to be present. However, as noted above, the jury may not stop there, but must engage in a balancing process weighing the totality of the mitigating circumstances against the totality of the aggravating circumstances before making a determination whether or not there are sufficient mitigating circumstances to preclude the imposition of the death penalty. As noted in *People v. Brownell* (1980), 79 Ill. 2d 508, 534, a balancing process is required by our statute and the discretion to be exercised by the sentencing body is controlled by objective standards so as to produce nondiscriminatory application of the penalty. We find this final constitutional challenge to be without merit.

In this case the sentencing hearing was a unitary and not a bifurcated hearing. The statute does not require or provide for a bifurcated sentencing hearing. However, this court has recognized that a bifurcated sentencing hearing may be held. At the first stage in the sentencing hearing the State must prove beyond a reasonable doubt one of the factors set out in section 9—1(b) (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)) which qualify a defendant for the death penalty. The second phase is commonly referred to as the aggravation/mitigation phase. (See *People v. Free* (1983), 94 Ill. 2d 378, 418-27; *People v. Ramirez* (1983), 98 Ill. 2d 439, 464-71.) The defendant contends that the holding of a unitary sentencing hearing instead of a bifurcated hearing deprived him of his constitutional rights.

We note first that the defendant never requested a bifurcated sentencing hearing nor objected to the holding of a unitary sentencing hearing. The defendant now argues that at the sentencing hearing the jury heard evidence concerning the defendant's prior convictions and his conduct in jail before making this finding that the defendant was eligible for the death penalty. At the time this evidence was offered the defendant did not object on that ground to its introduction. Not having raised these issues at the trial level the defendant has waived them and may not raise them in this court.

For the reasons set forth in this opinion, we affirm the conviction and sentence of death imposed by the circuit court of Winnebago County. The clerk of this court is directed to enter an order setting Tuesday, May 28, 1985, as the date on which the sentence of death, entered in the circuit court of Winnebago County, is to be executed. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of this order shall be furnished by the clerk of this court to the Director of Corrections, to the

warden of Stateville Correction Center, and to the warden of the institution wherein the defendant is confined.

*Judgment affirmed.*

JUSTICE WARD took no part in the consideration or decision of this case.

JUSTICE SIMON, concurring in part and dissenting in part:

I concur in the majority's judgment that the defendant's conviction for murder should be affirmed, but I dissent from the decision to impose the death penalty for the reasons set forth in my separate opinions in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting), in *People v. Silagy* (1984), 101 Ill. 2d 147, 184 (Simon, J., concurring in part and dissenting in part), and in *People v. Albanese* (1984), 104 Ill. 2d 504 (Simon, J., concurring in part and dissenting in part).