THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LINWOOD SLUDER, Defendant-Appellant.

Third District    No. 80-237

Opinion filed June 24, 1981.

Robert Agostinelli and Frank Ralph, both of State Appellate Defender's Office, of Ottawa, for appellant.

Gary L. Peterlin, State's Attorney, of Ottawa (John X. Breslin and Gary F. Gnidovec, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE STOUDER delivered the opinion of the court:

Defendant Linwood Sluder was charged by information with aggravated kidnapping, armed violence, and unlawful restraint, and a three-count indictment charging the same offenses was subsequently returned by the grand jury. After the denial of his motions to suppress statements and strike State's answer to discovery, defendant was tried by jury in the circuit court of La Salle County, convicted of armed violence, and sentenced to 25 years in the Department of Corrections consecutive to any sentence he might receive for parole violation.

At approximately 11:45 p.m. on October 31, 1979, Earlville police officers noticed an automobile run a stop sign. After radioing a second squad car, one officer stopped the vehicle and asked the driver, Joseph Ernst, for his license. Ernst, the State's primary witness in this cause, explained he had no license. Defendant, who was seated in the passenger seat, explained neither had identification and both were on their way home. Ernst then whispered to the officer, who requested he step out of the automobile. As he exited from the vehicle, Ernst broke into a crouched run and shouted, "He's got a gun." A second officer had a handgun pointed at defendant and asked him to also step out of the automobile. When he did so, he was searched, handcuffed and arrested.

According to one of the officers, defendant had dropped a handgun he had been holding in his right hand. A loaded revolver which was neither checked for fingerprints nor traced, was subsequently located near the passenger side of the car. Defendant had repeatedly told the officers that the gun belonged to Ernst or that Ernst also had a gun. Defendant was found to be carrying a box of ammunition and four bottles of whiskey were found within the automobile. At trial, Ernst admitted he had been given court supervision on a reckless driving charge and that driving with open liquor or a weapon in his car would have violated such

supervision. He also admitted that a bag of liquor bottles on the vehicle's console would have been easily observed by the police. Ernst, who was originally handcuffed by the police, was released when he stated that he had been abducted by defendant.

Ernst originally told the police that he was forced to stop his automobile on the Marseille Blacktop as defendant was standing in the roadway, and oncoming traffic prohibited an evasionary move. At trial, Ernst stated that he had voluntarily picked up defendant, who was hitchhiking, and had never told police that defendant had forced his way into the vehicle. Michael Miller, a classmate and friend of Ernst, testified that Ernst related the original version of the entrance on the day following the incident. Ernst testified defendant thereafter pulled out a revolver and ordered him to drive according to his instructions. Claiming to be low on fuel, Ernst stated he drove into Earlville and intentionally ran the stop sign.

The first of defendant's five assignments of error is that the trial court erred in denying his motion to suppress statements as, prior to the statements, he had made a clear and unequivocal request for counsel which was not honored by his police interrogators. We shall recite those additional facts necessary for an understanding of this contention.

At approximately 2:25 a.m. on November 1, 1979, Investigator Thomas Templeton met with defendant in an interview room at the La Salle County Correctional Center. Defendant was read his *Miranda* rights and, at Templeton's request, signed a form acknowledging receipt of the warnings. When Templeton requested defendant sign the waiver-of-rights section of the form, defendant pushed the document across the table and stated that he wanted to see a lawyer and would not talk to anyone. According to Templeton, defendant also stated that he was being "framed" as he had first seen the handgun when it fell out of the automobile onto the ground. Templeton's recollection of the early morning interview was corroborated by Sheriff's Deputy Allen Mertes, with both officers stating the conversation was then terminated and defendant was permitted to make telephone calls.

At approximately 1:50 p.m. on that day, defendant was taken from his cell and again placed in an interview room. After Captain William Dummett ascertained that defendant recognized Templeton and himself, he asked defendant if he had been read, and understood, his rights. After receiving an affirmative response, Dummett told defendant he was entitled to an attorney and that the public defender could be appointed, but defendant indicated he would retain his own counsel. After defendant, according to Dummett, indicated he would still talk to the officers, he then stated he had gotten the handgun in Tennessee and let it drop outside the automobile when he was apprehended by police. Templeton corroborated Dummett's recollection of the second interview. Defendant testified at

the suppression hearing that he was not apprised of his rights and was questioned in spite of his insistence that he wanted an attorney. Defendant was thereafter taken to court, and the public defender was appointed to represent him.

Dummett testified at the suppression hearing that he was unaware that defendant had requested an attorney and, after initially contending defendant's statement had been volunteered, admitted that a police report indicated that defendant had been asked where he had gotten the gun. Templeton acknowledged that when Dummett and he went to speak with defendant, he knew there was a possibility that counsel would be appointed. When asked if he and his captain had gone to take a final attempt at getting defendant to talk, he replied, "Yes, Dummett and I had discussed whether or not we would talk to him." At trial, Dummett characterized the interview as a "social conversation."

In *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, the Supreme Court set out the procedures to be followed by law enforcement officers to ensure protection of a suspect's constitutional rights. In addition to outlining the specific warnings to be given, the court stated:

> "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. * * * If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent." *Miranda v. Arizona* (1966), 384 U.S. 436, 473-74, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1627.

In the case at bar, defendant made an unequivocal request for counsel when he was first questioned in the early morning of November 1, 1979. Templeton himself testified that it was clear that defendant would not speak without an attorney. The police then equally unequivocally ceased their interrogation. The constitutional integrity of this initial interrogation is beyond reproach.

In the early afternoon of that day, and minutes before defendant was to be taken to court for the setting of bond, Templeton returned with Dummett, who stated the officers desired to speak to defendant "about this incident." The officers never gave defendant his full *Miranda* warnings, but Dummett did ask him if he had been read, and if he understood, his rights. After defendant responded affirmatively, Dummett

reminded him that he was entitled to an attorney, who could be appointed. Defendant again stated that he intended to retain his own counsel. After telling defendant that he did not have to speak with them, Dummett asked him if he "still wanted to talk to me," and the defendant replied in the affirmative.

After delineating the specific warnings that must be given to an accused, the *Miranda* court went on to address the waiver of the underlying constitutional rights:

"The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." (*Miranda v. Arizona* (1966), 384 U.S. 436, 444-45, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1612.)

The court later considered the effect of further questioning in this situation:

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. *Escobedo v. Illinois*, 378 U.S. 478, 490, n.14. This Court has always set high standards of proof for the waiver of constitutional rights, *Johnson v. Zerbst*, 304 U.S. 458, (1938), and we re-assert these standards as applied to in-custody interrogation." (*Miranda v. Arizona* (1966), 384 U.S. 436, 475, 16 L. Ed. 2d 694, 724, 86 S. Ct. 1602, 1628.)

Our issue is whether the People have met that heavy burden as it specifically concerns waiver of the right to counsel.

The benchmark in this situation differs from that where only an accused's right to remain silent is involved. As noted by our supreme court:

"[W]e are not concerned here only with the defendant's asserted right to remain silent but also his asserted right to have an attorney present. In *Michigan v. Mosely* (1975), 423 U.S. 96, 102-03, 46 L. Ed. 2d 313, 321, 96 S. Ct. 321, 326, the Supreme Court clearly distinguished between those two rights. Discussing the right to remain silent, that court ruled that *Miranda* cannot reasonably or 'sensibly be read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.' But the Supreme Court added, '[*Mosley*] does *not* involve the procedures to be followed if the person in custody asks to

consult with a lawyer,' and then quoted *Miranda*: 'If the individual states that he wants an attorney, the interrogation *must cease until* an attorney is present. * * *' (423 U.S. 96, 101 n.7, 46 L. Ed. 2d 313, 320 n.7, 96 S. Ct. 321, 325 n.7.) (Emphasis added.) When the statements were taken from the defendant, an attorney, requested by the defendant, was not yet present. Accord, *People v. Washington* (1977), 68 Ill. 2d 186, 192-93." *People v. Medina* (1978), 71 Ill. 2d 254, 261, 375 N.E.2d 78, 80.

In the case at bar, defendant unequivocally stated that he wanted to see an attorney during his initial interrogation. While indicating his willingness to discuss the incident which led to his arrest, he clearly indicated his intention to retain an attorney during his second interrogation. Under these circumstances, we do not find that the People met their burden of establishing a knowing and intelligent waiver of the right to counsel. The recent case of *Edwards v. State* (Ariz., May 18, 1981), 29 Crim. L.Rep. 3037, is in accord with the views expressed in this opinion emphasizing that once an attorney has been requested, the crucial issue is whether the defendant thereafter knowingly and voluntarily relinquishes his right to counsel. The trial court erred in reversing its original decision to suppress those statements made after the initial request for counsel, and the statements should have been suppressed. Accordingly, this case must be reversed and remanded for a new trial.

For the foregoing reasons the judgment of the circuit court of La Salle County is reversed and remanded for a new trial consistent with the views expressed herein.

Reversed and remanded.

ALLOY and HEIPLE, JJ., concur.