THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WALTER LANE, Defendant-Appellant.

First District (1st Division)    No. 1—88—1561

Opinion filed December 13, 1993.

40

Rita A. Fry, Public Defender, of Chicago (Fred Weil, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Rebecca Davidson, and Carol L. Gaines, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant Walter Lane was found guilty of the first degree murder of George Victor Malmgren and his wife, Raquel. Defendant was also found guilty of two counts of aggravated kidnapping and one count of armed robbery. Defendant was sentenced to natural life imprisonment for the murders, concurrently sentenced to 60 years' imprisonment for armed robbery and consecutively sentenced to 60 years' imprisonment for aggravated kidnapping. Defendant now appeals.

The record on appeal indicates the following facts. On March 28, 1988, Royal and Merle Lane, defendant's parents, appeared in court pursuant to a subpoena. The trial court excused them for the day prior to *voir dire* in this matter. The State then relayed to the trial court a request by members of the victims' family to be present in court during jury selection. The trial court asked whether there was any objection to the presence of members of defendant's family or the victims' family during *voir dire*. The State noted that it was concerned that the courtroom was crowded and the possibility that family members might be seated close to the potential jurors, but indicated that because the family members made inquiry with the State, the request was made for the court's decision. The trial court concluded that the courtroom was crowded and stated "none of them in here for jury selection."

Before commencement of the trial, defendant moved *in limine* to bar the State from mentioning its intention not to seek the death penalty in this case. Defendant also moved to bar the State from introducing a statement made by defendant to Cook County sheriff's department detective Mark Baldwin, who brought defendant to this jurisdiction from Rome, Italy, following extradition proceedings. The gist of defendant's statement was that he "had already won" because he could not receive the death penalty. It appears that the State agreed not to seek the death penalty in this case as a condition of defendant's extradition from Italy. The trial court granted defendant's request to bar the State from stating its intentions, but denied the request to bar defendant's statement.

The following testimony and evidence was adduced at trial. Viola Malmgren testified that she saw her son George and his wife Raquel

on June 29, 1985, but never saw them alive again. Viola testified that her son "Vic" had been the chief financial officer for Malanco, a paper and plastic packaging company founded in part by her husband and his father. Malanco was acquired by a company called Ivex; Vic became a vice-president and internal auditor with that company. Vic was also a director of the Heritage County Bank in Blue Island, Illinois (Bank).

Viola testified that in 1985, Vic, Walter Miller and three others helped her move furniture from Michigan City, Indiana, to Wheaton and Palos Heights, Illinois. Walter Miller owned Stonehouse Trucking, which carried Malanco freight. Viola presumed that the three other men were Stonehouse employees.

Thomas Pachoca testified that he was a vice-president and senior loan officer of the Bank on July 1, 1985. Pachoca testified that at approximately 2 p.m. that day, Vic came into his office and asked for $15,000 in cash quickly. Pachoca stated that Vic appeared nervous. Pachoca testified that as he arranged to have the money debited from Vic's account, Vic stated somewhat under his breath that "they or he has my wife out in the car." As the two men prepared to get the money, Vic told Pachoca that he should not have said what he said and asked Pachoca not to say anything. Pachoca testified that Malmgren received the $15,000 in $100 bills and left the Bank. Pachoca then spoke with other Bank officials; they notified the police shortly thereafter.

Toni Ebeling testified that she had been the cashier who gave the $15,000 to Vic. Ebeling asked Vic if he wanted her to count the money out for him. Vic replied, "No, you don't have to count it out. You're better at it than me. They can take it the way they get it." On redirect examination, Ebeling indicated that she had seen Vic before and that day he appeared nervous with a sort of blank stare.

Blue Island police officer Phillip Contreras testified that he was on patrol on July 1, 1985, when he received a call at 5:19 p.m. to investigate some possible bodies found off the side of the road. Contreras drove to a location where he met the complainant, who Contreras believed was named Lane. The two men drove down Aulwurm Drive, where the complainant pointed out the bodies. Contreras radioed his superiors and the Cook County sheriff's department. Contreras preserved the scene until the arrival of county investigators approximately 10 minutes later.

Cook County sheriff's police officer Henry Speight testified that he was an evidence technician called to the site in Blue Island on July 1, 1985. After photographing the scene, Speight made a preliminary inspection of the bodies, which he later learned were those of

Vic and Raquel Malmgren. Raquel appeared to have a gunshot wound in the back of the neck. Vic appeared to have gunshot wounds behind his left ear and to his left shoulder. Speight also noticed that Vic appeared to have a laceration on the tip of his thumb and grass stains on his knees. Vic had between $90 and $100 on his person, but also had a Bank receipt for $15,000.

The next day, after attending an autopsy of the bodies, Speight was given hair, blood and fingernail samples, together with the clothing and projectiles taken from the bodies. On cross-examination, Speight indicated that he could not say whether the two were killed at the place they were found. Speight also indicated that no usable fingerprints were found at the scene.

Dr. Robert Stein, the chief medical examiner for Cook County, testified that he performed the autopsies of Vic and Raquel Malmgren. His examination of Vic's body revealed three bullet wounds to the back of the head and one to the left shoulder. The first bullet penetrated the skull and brain; the bullet and a fragment were recovered. The second bullet did not penetrate the skull; it undermined the scalp and exited—creating the third wound—in a manner suggesting a downward trajectory. Dr. Stein opined that this trajectory would be consistent with a man being put on his knees before he was shot. Dr. Stein testified that his examination of Raquel's body indicated a single bullet wound in the back of the head. A bullet was retrieved from one of the lobes of her brain; this bullet appeared to have a level trajectory. Dr. Stein indicated that both died from a gunshot wound to the head. Dr. Stein was unable to determine the time of death of either victim, whether they were shot by the same gun or whether they were shot at a location other than the place the bodies were discovered.

Thomas Amadio testified that he had once worked for the same company as Joe Lane, defendant's cousin. Joe Lane introduced Thomas to defendant, who frequented a restaurant owned by Thomas Amadio's father. Thomas and defendant would go out drinking two or three times a week. Thomas testified that defendant was a truck driver for Stonehouse Trucking at the time. Thomas and defendant also sold dental insurance together for a company started by defendant and Thomas' father. The insurance enterprise was expected to feed some business to Dr. Thomas Rothrock, who was a partner of Thomas Amadio's brother-in-law.

In April 1985, defendant told Thomas Amadio that he had moved a family member—perhaps the grandmother—of the president of Ivex, from Michigan City. Defendant told Thomas Amadio that he had not been paid and was very upset. In early May 1985, while the

two men were drinking, defendant told Lane that it would be easy to get money from the president of Ivex by grabbing a member of his family and holding him or her until the president got money from the bank. Defendant told Thomas Amadio that he would not leave any witnesses and knew over 100 ways to kill people. Thomas dismissed the idea and told defendant that he was crazy. In late May 1985, defendant initiated a similar conversation; Thomas again dismissed the conversation.

Thomas Amadio testified that he saw defendant carry a gun almost every day in April and May 1985. Thomas identified one of these guns as a Charter Arms .38 caliber revolver. Thomas indicated that defendant's job at Stonehouse required driving into the "inner city" in Chicago.

Anthony Amadio, Thomas Amadio's father, testified that defendant used to frequent his restaurant. Anthony testified that he and defendant incorporated a company to sell dental insurance, but defendant did not contribute money, hold stock or an office in the corporation. Anthony never gave defendant $15,000 or $18,000 in cash. Anthony once saw defendant carrying a Charter Arms .38 caliber revolver in the spring of 1985. Anthony indicated that defendant had purportedly been working on a deal with Ivex, but no deal materialized.

Dr. Thomas Rothrock testified that he met defendant in 1984 or 1985 and that they frequently discussed guns. In March or April 1985, the two made plans to go shooting, but were unable to shoot because the range was closed. At this time, Dr. Rothrock gave defendant between 10 and 15 "reload" bullets, which are rebuilt bullets with hard cast lead instead of copper-jacketed lead. Dr. Rothrock also saw defendant with the .38 caliber Charter Arms.

Walter Miller testified that prior to his retirement, he owned Stonehouse Trucking, which had originally been owned by Vic's grandfather. Miller testified that Stonehouse did not make deliveries for any companies other than Malanco and Ivex. Miller testified that defendant had been employed at Stonehouse as a truck driver and had not held any other position. Miller was shown a business card indicating that defendant was a vice-president of the company, listed Ivex's address and defendant's home telephone number. Miller denied that defendant was ever vice-president of the company.

Miller testified that defendant's father, Royal Lane, and brother Patrick were also employed by Stonehouse. Miller indicated that defendant was asked to leave Stonehouse just after Memorial Day in 1985.

Miller testified that he, his cousin and the Lanes did some moving

for Vic Malmgren between Michigan City, Indiana, and Vic's house in Palos Heights, Illinois. Defendant told Miller he had left keys and a jacket at Vic's house. Miller stated that he paid the others and was reimbursed by Vic for the work. According to Miller, defendant owed Miller approximately $1,100 when he left Stonehouse. Miller stated that when he purchased Stonehouse from Vic and Viola Malmgren, Miller told Royal Lane and defendant that he would split any profits with them. However, Miller stated that there never were any such profits.

Patrick Lane testified that on June 27, 1985, he received a telephone call from his mother asking him to rent a car. Patrick testified that he rented a red or maroon Chevrolet Cavalier from Ted Horton Chevrolet in Harvey, Illinois, and left the car and keys with his mother or defendant at his parents' house in Sauk Village. According to Patrick, his mother told him to give the keys to defendant. He did not remember if he did so, but testified that "the keys got to" defendant. Later that day, Patrick received another telephone call from his mother, this time asking him to rent a hotel room for defendant. Patrick indicated that he rented a hotel room in Harvey for two days. Patrick testified that he came into possession of the rental car again a few days later, cleaned the car and returned it.

Larry Vedas, the rental manager for Ted Horton Chevrolet, testified that Patrick Lane rented a maroon Chevrolet Cavalier on June 27, 1985, that was returned on July 3, 1985. The car had been driven 1,022 miles.

Royal Lane, defendant's father, testified under a grant of immunity. Royal testified that in June 1985, defendant was not living at home or working at Stonehouse Trucking. Royal testified that he and his wife left their home in Sauk Village on June 29, 1985, and stayed in Angola, Indiana, through July 5, 1985, with Royal's brother-in-law, Roland Hargus.

Royal testified that he did not expect defendant in Angola, but noticed him in the rental car when he was about two blocks from the Hargus house trailer. Defendant stayed by himself in the smaller bedroom of the house trailer. Over the weekend, defendant mentioned that he was going to Chicago Heights, Illinois, on Monday, July 1, 1985, to collect some money from Amadio regarding "[s]ome kind of dental deal."

Royal testified that on July 1, 1985, he awoke around 10 or 11 a.m., to find defendant was already gone. According to Royal, he saw his son in Angola again at approximately 2 p.m. Royal denied having told a Cook County sheriff's investigator that his son was not home until "later in the afternoon." Royal also denied having told the investigator that he could not remember a specific time.

Royal testified that when defendant returned, defendant gave Royal $5,000 in $100 bills. Royal saw defendant with a bundle of money that was about two inches thick. Royal indicated that in the evening of July 1, 1985, he, his wife and defendant went to an American Legion hall. According to Royal, the bartender was named Jackie. Royal indicated that he did not remember seeing anyone playing cards at the Legion hall that evening. He admitted that he may have told the prosecution that he did not see anyone playing cards that evening. Royal further testified that on July 2, 1985, he and defendant went to a travel agency, where defendant bought a ticket; defendant told Royal he was going to Seattle.

Norma Hart testified that on July 2, 1985, she was a travel agent in Angola. Hart saw two men, one older and one younger, come into her agency; she identified the younger man as defendant. Defendant told her that he wanted a ticket to travel from Fort Wayne, Indiana, to Seattle on July 4, 1985. Defendant identified himself as David Michaels and provided her an Illinois phone number. Hart testified that defendant paid the $419 fare with $100 bills.

Jacqueline Brogan testified that she was the bartender at American Legion Post 31 in Angola. Brogan testified that on July 2, 1985, defendant and his parents arrived at the Legion hall at approximately 3:30 p.m. and left at midnight. Defendant paid for drinks for his parents with a $100 bill. According to Brogan, defendant told her that he had sold one of his companies. Brogan stated that when defendant opened his billfold, she saw a stack of money one inch thick. Defendant told her he had made $18,000 from the sale. On July 3, defendant again paid for drinks with a $100 bill and told Brogan he was leaving for Japan the next day. Brogan further testified that the Lanes were not at the Legion hall on July 1, 1985; there was a party where people were playing Euchre which the Lanes did not attend.

Cook County sheriff's police Detective Mark Baldwin testified that he was assigned to the Malmgren homicide on July 1, 1985. Detective Baldwin testified that he spoke with Patrick Lane in the course of his investigation. Upon learning that Patrick had rented a car for defendant, Detective Baldwin contacted Ted Horton Chevrolet on July 9, 1985. Detective Baldwin learned that the maroon Cavalier at issue had been returned on July 3, 1985, had been rented again and was due to be returned later on July 9, 1985. He asked Ted Horton Chevrolet not to clean the car and keep it in a clean location until he could arrive on July 10, 1985. Baldwin then took the car to a police lot.

Cook County sheriff's police officer Lawrence Evans testified that on July 11, 1985, the rental car's seats were removed from the car

and inventoried. Officer Evans indicated that the car was "processed." Alan Kulovitz testified that he was the evidence technician at the time, that photographs and fingerprints were taken and trace evidence was collected with a micro-vacuum. James Krell, who was also an evidence technician at the time, removed and inventoried six cloth standards from the rental car interior on July 19, 1985.

Brent Cutro testified that he was a forensic scientist employed by the Illinois State Police. Cutro was qualified as an expert in latent fingerprint examination. He indicated that he was provided with fingerprints from the rental car, but that these prints did not match the victims or the defendant. Cutro did not find defendant's fingerprints in the Malmgren home.

David Metzger testified that he was a microscopy coordinator with the Illinois State Police Forensic Science Laboratory in Carbondale, Illinois, and had conducted thousands of fiber analyses in the course of his career. Metzger testified that he compared fibers found on the Malmgrens' clothes with standards taken from the rental car seats and interior. Metzger indicated that the fibers found on the Malmgrens' clothes were consistent in color with the standards taken from the car. In one instance the color was identical. Metzger concluded that the fibers found on the victims' clothes could have come from the rental car, but admitted that they could have come from other sources also.

Judy Welch, a forensic scientist with the Illinois State Police Crime Laboratory in Joliet, studied the color and composition of the fibers and standards. Welch concluded that the fibers found on the victims' clothes could have originated from the fabric in the seat standards. Welch also examined fabric from the Malmgrens' cars and determined that the fibers found on the Malmgrens' clothes did not originate from fabric in their cars.

Michael Podlecki, a forensic scientist with the Illinois State Police in Maywood, testified that he found a limited quantity of blood under the Malmgrens' fingernails, but was unable to determine the blood type. Podlecki also scraped down the Malmgrens' clothes to obtain hair samples. He found samples that were consistent with the Malmgrens' hair, but not with defendant's hair. He also analyzed the trace evidence collected from the rental car by micro-vacuum, but did not find hair consistent with the Malmgrens' hair. Podlecki indicated that a previous vacuuming of the car might have destroyed or removed evidence from the car.

Detective Baldwin testified that on July 12, 1985, he drove to Angola, where he met with Roland Hargus and was allowed inside the house trailer. Detective Baldwin found a bullet on the dresser in the

·bedroom that defendant had used the previous weekend. Detective Baldwin inventoried the bullet and turned it over to the crime lab.

Robert Shem testified that he was a forensic firearm and tool mark examiner formerly employed by the Illinois State Police. He indicated that he examined a bullet taken from Raquel's body and determined it was a .38 caliber cast lead bullet, similar to a reload. Shem also examined the rifling characteristics of the bullet, finding eight lands and grooves with a right twist. These characteristics are indicative of certain types of guns, including a Charter Arms. Shem admitted that these characteristics are indicative of other .38 caliber guns as well.

Shem also examined a copper bullet jacket and three fragments of lead that were taken from Vic's body and which he received from the coroner's office. One of the fragments appeared to be the lead core from the jacketed bullet. Both the jacket and the core were .38 caliber and had the same rifling characteristics as the first bullet. However, Shem testified that he did not compare the markings on the jacket to those on the first reload bullet, as such comparisons generally cannot be made.

Shem testified that he also examined the .38 caliber cartridge and bullet recovered from the Hargus house trailer in Angola. Shem noted that the cartridge had markings that looked like they might have been made by a reloading machine. The bullet was a cast bullet similar to the bullet taken from Raquel's body. Shem was unable to conclude whether any of the bullets he examined were fired from the same weapon. According to Shem, the two cast bullets were packaged and sent to the Federal Bureau of Investigation (FBI) for further analysis.

Federal Bureau of Investigation Special Agent John Riley testified that he was assigned to the elemental and metal analysis unit of the Bureau's laboratory in Washington, D.C. He was qualified as an expert in the composition of bullet lead. Special Agent Riley testified that while lead bullets are made of 95% to 99% lead, antimony is often added to strengthen the lead; however, antimony will not be added where a copper jacket is used to add hardness. In addition, copper and arsenic are found as contaminants in bullet lead.

Special Agent Riley testified that the composition of the bullet lead can be determined by a process called neutron activation. In this process, a sample of the lead is flattened into a disc, which is placed in a container and lowered into the core of a nuclear reactor. The sample becomes radioactive. Because each element emits its own characteristic gamma ray, the composition of elements in the sample

can be determined by calculating the gamma rays emitted by the sample as a whole.

Special Agent Riley examined the two cast bullets sent to the FBI by Robert Shem. According to Special Agent Riley, all three elements existed in both bullets in exactly the same percentages. He testified that the two bullets were analytically indistinguishable. Special Agent Riley opined that the two bullets came from the same source and that the match was as good as he had ever seen in his 20 years with the FBI.

Detective Baldwin testified that on July 13, 1985, he spoke with Ms. Hart at her travel agency and showed her a photograph of defendant. According to Detective Baldwin, Ms. Hart said defendant looked like someone who had bought a ticket to Seattle under the name of David Michaels. Detective Baldwin also interviewed Ms. Brogan. An arrest warrant for defendant was issued on July 23, 1985; as of that date, Detective Baldwin had knowledge that defendant was in Japan. The police enlisted the aid of the FBI and Interpol. Following an interview with a neighbor of the Lane family and consultation with the FBI and Interpol, Detective Baldwin was notified of defendant's arrest in Rome, Italy, on September 14, 1985.

Following a 10-month extradition process, Detective Baldwin and Investigator Cliff Johnson went to Rome on July 24, 1986, to arrest and return defendant to Illinois. The police met defendant in an airline security office, at which time Detective Baldwin explained to defendant that he was investigating the Malmgren murders and was there to return defendant to Illinois. According to Detective Baldwin, he advised defendant of his constitutional rights and defendant acknowledged his understanding of those rights.

Detective Baldwin testified that he knew defendant had been represented by counsel in Italy. Detective Baldwin also testified that defendant stated that he was going to hire a lawyer upon his return and he thought he might beat the charges against him. According to Detective Baldwin, defendant also stated that "You can look at it this way. I have already won, because they can't give me the death penalty now." Defendant then stated that while he did not object to Detective Baldwin's questions, he was not going to discuss the Malmgren murders at that time.

Following closing arguments, jury instructions and deliberations, defendant was found guilty of the murder and aggravated kidnapping of Vic and Raquel Malmgren and the armed robbery of Vic Malmgren. Defendant now appeals.

I

Initially, defendant contends that the trial court erred in allowing

Detective Baldwin to testify regarding defendant's statement that "You can look at it this way. I've already won because I can't get the death penalty now." Defendant claims that the statement was an irrelevant nonadmission that unduly prejudiced his case. Defendant also claims that admitting the statement violated rights guaranteed him by the fifth and sixth amendments to the Constitution. We consider each claim in turn.

### A

Defendant argues that the statement was not admissible as an admission. An admission is a statement or conduct from which guilt may be inferred, when taken in connection with other facts, but from which guilt does not necessarily follow. (*People v. Stewart* (1984), 105 Ill. 2d 22, 57, 473 N.E.2d 840, 857.) Admissions are not objectionable under the rule against hearsay. See *Stewart*, 105 Ill. 2d at 57, 473 N.E.2d at 857.

The record in this case seems similar to the facts of *People v. Stevenson* (1990), 198 Ill. App. 3d 376, 385, 555 N.E.2d 1074, 1079, in which the defendant indicated that he was glad that the crime occurred in a particular county because he would probably receive a four-year sentence and could come back and finish the job. This court held defendant's statement was an admission of guilt. Although defendant here made no reference to "finishing the job," his statement suggests that he was pleased that his presence in Italy would result in avoidance of the death penalty. *Stevenson* suggests that a statement that focuses on the severity of punishment rather than the issue of guilt or innocence may imply guilt. Indeed, defendant states elsewhere in his brief that mentioning the extradition agreement to the jury would be prejudicial because "the imposition of the death penalty would come only after a finding of guilt. Therefore, it would seem a foregone conclusion that Lane must be guilty." Thus, the statement here was an admission probative of guilt.

Defendant argues that admitting the statement "violated the spirit of the agreement between Italy and the United States." However, defendant provides no authority for this argument, let alone support for its accuracy. Thus, the argument is waived.

Defendant argues that the statement was inadmissible "because it was, in effect, a plea-related statement" inadmissible under Supreme Court Rule 402(f) (134 Ill. 2d R. 402(f)). Defendant admits that "Rule 402(f) does not technically apply" to this case. We conclude that Rule 402(f) has no application to this case. The agreement at issue is not a plea agreement.

In sum, defendant has failed to show that his statement was not an admission relevant to his guilt or innocence.

## B

Defendant also claims that the statement should not have been admitted because it was elicited by the police in violation of his fifth and sixth amendment rights to counsel. In general, once a person in custody asserts the fifth amendment right to counsel, further interrogation by the authorities must cease until counsel has been made available, unless the accused initiates further conversation. (*Minnick v. Mississippi* (1990), 498 U.S. 146, 150, 112 L. Ed. 2d 489, 495-96, 111 S. Ct. 486, 489.) The fifth amendment right to counsel barring reinterrogation is thus tied to custodial interrogation and the protection of previously asserted *Miranda* rights. (See *Minnick,* 498 U.S. at 150-51, 112 L. Ed. 2d at 496, 111 S. Ct. at 489-90.) The sixth amendment guarantees criminal defendants the right to the assistance of counsel at post-indictment interviews with law-enforcement authorities. (*Patterson v. Illinois* (1988), 487 U.S. 285, 290, 101 L. Ed. 2d 261, 270-71, 108 S. Ct. 2389, 2393.) However, the fact that the sixth amendment right comes into existence with the accused's indictment does not automatically bar interrogation; the accused must seek to exercise this right. (*Patterson,* 487 U.S. at 290-91, 101 L. Ed. 2d at 271-72, 108 S. Ct. at 2393-94.) Indeed, under either amendment, the admonishment of the accused in accord with *Miranda* will generally suffice to render any subsequent waiver of those rights valid as a matter of law. *Patterson,* 487 U.S. at 296-97, 101 L. Ed. 2d at 275, 108 S. Ct. at 2397.

The Illinois case most directly relevant to this appeal is *People v. Young* (1992), 153 Ill. 2d 383, 607 N.E.2d 123. In *Young,* the defendant was apprehended in Wisconsin and was represented by a public defender in hearings relating to custody and extradition. (*Young,* 153 Ill. 2d at 386, 607 N.E.2d at 124-25.) When defendant's counsel notified the Wisconsin trial court that defendant would waive extradition, counsel also notified the court that defendant was asserting his fifth and sixth amendment rights to counsel; defendant orally confirmed these assertions. (*Young,* 153 Ill. 2d at 386-87, 607 N.E.2d at 125.) Defense counsel requested that the court inform the Illinois authorities of these assertions and enter an order for defendant to show the Illinois authorities; the court agreed to enter the order, but there was no record of its entry. (*Young,* 153 Ill. 2d at 387, 607 N.E.2d at 125.) Neither of the Illinois police officers who transported defendant to Illinois was informed of defendant's assertion of rights.

(*Young*, 153 Ill. 2d at 387, 607 N.E.2d at 125.) The police informed defendant of his *Miranda* rights; defendant made incriminating statements.

Our supreme court held that the statements need not be suppressed. First, the supreme court held that imputing the knowledge of the Wisconsin authorities to the Illinois authorities did not serve the purposes of the intrastate imputation rule, namely: (1) preventing an accused's request for counsel from being circumvented by transfer among law enforcement entities; and (2) protecting the accused from badgering a suspect into confessing. (*Young*, 153 Ill. 2d at 390-95, 607 N.E.2d at 126-29.) Second, our supreme court held that the Chicago police had no duty to inquire of the Wisconsin authorities whether defendant had asked for the assistance of counsel. (*Young*, 153 Ill. 2d at 395-401, 607 N.E.2d at 129-32.) Finally, the *Young* court determined that the defendant's sixth amendment right had not attached at the time he made the incriminating statements. *Young*, 153 Ill. 2d at 401-06, 607 N.E.2d at 132-34.

■ Defendant notes that his case differs from *Young* insofar as his sixth amendment right to counsel had attached with his indictment. However, this case also differs from *Young* in that the record here does not indicate that defendant could and did invoke his fifth or sixth amendment rights prior to meeting Detective Baldwin. Indeed, international extradition is based on comity between sovereign nations; defendant seemingly has not shown that Italy allows defendants to invoke any right to counsel in either the fifth or sixth amendment sense in any context. (See *Sahagian v. United States* (7th Cir. 1988), 864 F.2d 509, 514 (discussing the courts of Spain).) This is particularly important in the context of extradition proceedings, which are summary and ministerial, rather than a judicial inquiry into the merits of a charge. See *Young*, 153 Ill. 2d at 403, 607 N.E.2d at 132.

Defendant notes that Detective Baldwin was aware that defendant was represented by counsel in the Italian extradition proceedings. However, defendant has failed to show from the record that this representation was caused by an assertion of a right to counsel binding American authorities. Indeed, defendant's statement that he was going to get a lawyer when he returned to this country—made prior to the statement defendant seeks to suppress—suggests that defendant did not consider the attorney in the extradition proceeding to be his attorney for the criminal prosecution.

Given that defendant was being transferred via Italian extradition proceedings, the Illinois authorities could not reasonably expect that defendant had previously invoked a right to counsel. (See *Young*,

153 Ill. 2d at 397, 607 N.E.2d at 129-30.) Even if this court were to assume, *arguendo* (and without any support in the record or citation to authority), that defendant could somehow invoke an American right to counsel in the context of an Italian extradition proceeding, this court might find it unreasonable to expect the Illinois authorities to be familiar with Italian legal procedures. (See *People v. Young* (1990), 201 Ill. App. 3d 521, 528, 558 N.E.2d 1287, 1292, *aff'd* (1992), 153 Ill. 2d 383, 607 N.E.2d 123.) In addition, defendant does not appear to have shown that he was transferred to the Illinois authorities in order to circumvent his constitutional rights. Nor does the record appear to indicate that the Illinois authorities "badgered" defendant into making the statement at issue here.

Moreover, it must be noted that the record on appeal indicates only that defendant here made statements to Detective Baldwin after being informed of his constitutional rights. As noted above, the fifth and sixth amendment rights to counsel protect criminal suspects from improper *interrogation*. An officer who reads a defendant the *Miranda* rights merely to verify that a defendant has been apprised of them is generally not "interrogating" that defendant in the constitutional sense. (See *United States v. Obregon* (10th Cir. 1984), 748 F.2d 1371, 1381.) Defendant does not seem to have shown that Detective Baldwin's actions here fall outside this category of proper procedure.

Defendant maintains that his statement of intent to "get a lawyer" upon his return to the United States constituted an assertion of his fifth and sixth amendment rights to counsel. Defendant relies on *People v. Sluder* (1981), 97 Ill. App. 3d 459, 423 N.E.2d 268. In *Sluder*, the investigator testified that defendant made an unequivocal request for counsel when he was first questioned. (*Sluder*, 97 Ill. App. 3d at 462, 423 N.E.2d at 270.) In contrast, following *Patterson*, this court has indicated that an accused's vague assertion that he or she intends to retain some unnamed attorney is too ambiguous to constitute an invocation of the right to counsel. (*People v. Farrell* (1989), 181 Ill. App. 3d 446, 450-52, 536 N.E.2d 476, 479-80.) This case is more similar to *Farrell* than to *Sluder*. Thus, defendant has failed to show that he asserted his rights to counsel.

Defendant argues in the alternative that he did not knowingly waive his rights to counsel. However, the record shows that defendant was informed of his *Miranda* rights and that defendant indicated he understood them. The record also indicates that defendant did not indicate that he was not going to talk about the Malmgren murders until after he made the statements at issue. Thus, defendant has failed to show that the waiver of his fifth and sixth amendment rights was invalid.

In sum, defendant has failed to show that the admission of defendant's comment was improper.

## II

Defendant contends that the State failed to prove him guilty of murder beyond a reasonable doubt. The relevant inquiry on appeal is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt, after viewing the evidence in the light most favorable to the prosecution. (*People v. Jimerson* (1989), 127 Ill. 2d 12, 43-44, 535 N.E.2d 889, 903.) It is axiomatic that determinations of the credibility of witnesses and the weight to be given to their testimony are the function of the trier of fact. This court will not disturb a guilty verdict unless the evidence is so improbable or unsatisfactory that it raises a reasonable doubt as to defendant's guilt. *People v. Brandon* (1990), 197 Ill. App. 3d 866, 874, 557 N.E.2d 1264, 1269.

■ Viewing the evidence in the light most favorable to the State, it appears that in August 1984 and twice in May 1985, defendant discussed abducting Vic or Raquel Malmgren so that the other Malmgren would withdraw money from the bank to pay defendant. Defendant believed he had been "stiffed" by Vic Malmgren in his business. At the end of May 1985, defendant was unemployed and owed his former employer over $1,000; defendant's car was left behind and later received a wage assignment. A jury could infer that defendant had financial problems.

Defendant owned a .38 caliber Charter Arms. In March or April 1985, defendant obtained 10 to 15 "reload" bullets for this gun from Thomas Rothrock. Defendant carried the gun in April and May 1985.

On June 27, 1985, defendant's brother rented a car and a hotel room for defendant. On July 1, 1985, Vic Malmgren withdrew $15,000 in $100 bills from the Heritage Bank. According to Thomas Pachoca, Vic Malmgren seemed nervous and stated that he needed the money quickly and "they or he have my wife in the car." Vic Malmgren told Pachoca that he should not have said this and urged Pachoca not to say anything. The Malmgrens were found shot to death in a grassy area three miles from the bank.

A cast bullet and a bullet jacket removed from the bodies were grooved in a manner consistent with a .38 caliber Charter Arms. A bullet recovered from defendant's bedroom in Angola, Indiana, had markings suggesting that it was a "reload" bullet. Neutron testing performed by the FBI indicated that the bullet recovered from defendant's bedroom was analytically indistinguishable from the

bullet taken from Raquel Malmgren's body. Fibers found on the Malmgrens' clothes were consistent with the seat fabric in the car rented for defendant; the fibers did not come from the Malmgrens' cars.

Later in the afternoon of July 1, 1985, defendant turned up in Angola, Indiana, whereupon he gave Royal Lane $5,000 in $100 bills. Defendant had a two-inch-thick bundle of money. During the next two days, defendant paid for drinks with $100 bills; defendant claimed he made the money "in a couple of hours" by selling his company. On July 2, 1985, defendant bought an airline ticket for Seattle with $100 bills. On July 3, 1985, defendant told a bartender that he was going to Japan; defendant left Angola the following day.

Given this record, a rational trier of fact could conclude that defendant was guilty beyond a reasonable doubt of the offenses with which defendant was charged. Indeed, the evidence is not closely balanced.

### III

Defendant claims that the trial court's decision to exclude members of defendant's and decedents' families from the courtroom during jury selection violated his sixth and fourteenth amendment right to a public trial. There is a presumption that criminal trials are to be open to the public. (*Press-Enterprise Co. v. Superior Court of California* (1984), 464 U.S. 501, 508, 78 L. Ed. 2d 629, 637, 104 S. Ct. 819, 823.) The public trial aspect of the sixth amendment extends to the jury selection process. (*People v. Taylor* (1993), 244 Ill. App. 3d 460, 463, 612 N.E.2d 543, 546.) The right to a public trial belongs to the accused, not to the public. (See *Waller v. Georgia* (1984), 467 U.S. 39, 46, 81 L. Ed. 2d 31, 38, 104 S. Ct. 2210, 2215.) This right, however, may be waived where the accused fails to object to the exclusion of the public. See *Levine v. United States* (1960), 362 U.S. 610, 619, 4 L. Ed. 2d 989, 996-97, 80 S. Ct. 1038, 1044.

The record indicates that before jury selection began in this case, the trial court excused defendant's parents, who had appeared in court under subpoena. The prosecutors informed the trial court that four or five members of decedents' family wished to observe the jury selection, but noted that the courtroom was crowded and raised concern that the family members might be seated close to the venirepersons. The trial court concluded that the courtroom would be too crowded and that none of the family members would be present for *voir dire*.

■ It seems clear from this record that defendant did not

contemporaneously object to the exclusion of the family members from the jury selection. Thus, the issue is waived.

Defendant concedes as much in his brief, but urges this court to review his claim under the plain error doctrine. Illinois Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)) provides that in an appeal of a criminal case, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." The doctrine may be invoked where the defendant has waived an argument, but the evidence is closely balanced or the error adversely affected the defendant's right to a fair trial. See *People v. Mullen* (1990), 141 Ill. 2d 394, 401-02, 566 N.E.2d 222, 226.

We must remember that this is a case of partial, rather than total, closure of a courtroom. In *People v. Priola* (1990), 203 Ill. App. 3d 401, 561 N.E.2d 82, the second district declined to find plain error in a case of partial closure, noting not only that the evidence was not closely balanced, but also that most of the trial was open and the media were never excluded. *Priola*, 203 Ill. App. 3d at 420-21, 561 N.E.2d at 790-91.

In this case, the evidence is not closely balanced. Defendant has not shown that the media were excluded. Nor has he shown that anyone else was excluded until the courtroom became crowded. Thus, we decline to invoke the plain error doctrine in this case.

## IV

Defendant argues that he was denied a fair trial due to the State's comments during trial. During opening and closing arguments, prosecutors have wide latitude to comment on evidence and draw reasonable inferences therefrom and, absent a clear abuse of discretion, a court's rulings on the scope of such comments will not be reversed on appeal. (See *People v. Rockman* (1986), 144 Ill. App. 3d 801, 813, 494 N.E.2d 688, 696.) Prosecutors may not argue facts not in evidence. (See *People v. Beier* (1963), 29 Ill. 2d 511, 516, 194 N.E.2d 280, 283.) Even so, such remarks do not warrant reversal unless they are so prejudicial that they constitute a material factor in the defendant's conviction. *People v. Townsend* (1985), 136 Ill. App. 3d 385, 394, 483 N.E.2d 340, 347.

■ Defendant claims that the State's opening argument that the jury would hear that fibers found on the Malmgrens' clothes would be identical to that of the car seats misstated the evidence. The record in this case indicates that defendant failed to object to the characterization of the expert testimony at trial and in his post-trial motion. Thus, the argument is waived on appeal.

However, even if the argument were not waived, it would fail to persuade this court. In *People v. Linscott* (1991), 142 Ill. 2d 22, 566 N.E.2d 1355, the prosecutor made an opening argument that hairs found on the victim's hand "matched" those of the defendant. The expert testimony, however, established only that the hair samples were "consistent" with defendant's hair. The supreme court held that the argument was improper, but would not warrant reversal by itself. *Linscott*, 142 Ill. 2d at 34-35, 566 N.E.2d at 1360-61.

In this case, Metzger testified that one of the fibers taken from the clothing was "identical" in color to standards taken from the car seats. Metzger testified that the color of other fibers was "consistent" with those from the car seats. Welch testified that the type of fibers found on the clothes was "consistent" with the type of the car seat fibers. Following *Linscott*, we conclude that the argument by itself does not warrant reversal in this case.

Defendant also claims that the State argued facts not in evidence when it argued that defendant had left Angola at 6:30 a.m. on the day of the murders. As with the comment on the fibers, defendant failed to object at trial or in his post-trial motion, thereby waiving the objection on appeal.

Assuming *arguendo* that the argument was not waived, it should be noted that the State does not dispute defendant's claim that there is no evidence indicating that he left Angola at 6:30 a.m. The record does indicate, however, that defendant had left Angola when Royal Lane awoke at 10 or 11 a.m. on the date in question. The record also indicates that Hart testified it took her about three hours to drive from Angola to the trial court, excluding a lunch stop. The record does not indicate whether Hart scrupulously observed the applicable speed limits. Hart also testified that there is a time difference of one hour between the two locations. The record indicates that Vic Malmgren entered the Heritage County Bank in Blue Island at about 2 p.m. on the date in question. Defendant has not presented any argument that a 6:30 a.m. departure from Angola was crucial to the State's theory of the case. The record suggests that the State needed to establish only that defendant left Angola before Royal Lane awoke to show that defendant could have reached the Malmgrens sufficiently prior to 2 p.m. to be the perpetrator in this case. Consequently, it would appear that the comment by itself does not warrant reversal in this case.

Defendant claims that the State made improper argument when attempting to explain why Vic Malmgren did not alert the bank employees to his situation. The prosecutor stated:

"Well, I have never been in that situation. I don't know if you

have ever been. I don't know if they have ever been, except for Lane, but maybe Vic Malmgren didn't anticipate getting shot in the head, that if he paid him, Walter Lane would leave them alone. Maybe that is what was running through his mind. Maybe he just didn't want to upset the apple cart and get he and his wife hurt."

Defendant claims that the State was suggesting to the jury that defendant had kidnapped or murdered others on prior occasions and that there was no such evidence in the record.

The State correctly points out that defendant made no objection to this argument at trial. Thus, defendant has waived the claim on appeal. Moreover, assuming *arguendo* that the claim had been preserved, it seems that the comment could just as easily suggest that the prosecutor did not know whether the Malmgrens had ever been in a kidnapping situation other than the one at issue here, for which the prosecutor believed Lane was responsible. A timely objection may have clarified this ambiguity.

Defendant claims that the State argued facts not in evidence when it argued that there were grass stains on the knees of Vic Malmgren's trousers and that the stains were evidence of an execution-style murder. Defendant notes that the State could not get one of their expert witnesses to testify that such stains existed.

Again, defendant failed to object to the argument at trial and in his post-trial motion, thereby resulting in waiver. Had defendant preserved the argument, it must be noted that Officer Speight did testify that there were grass stains—or what appeared to be grass stains—on Vic Malmgren's trousers. Moreover, Dr. Stein testified that while he could not recall whether there were grass stains on the trousers, the gunshot wound suffered by Vic Malmgren was consistent with Malmgren being put on his knees when he was shot. Thus, the State's argument appears to be based upon the evidence and reasonable inferences from that evidence.

Defendant claims that the State made improper argument when it stated that Royal Lane testified because he wanted immunity, not because he received immunity, and that there was a big difference between the two situations. Defendant claims that this is similar to compelling a witness to claim the fifth amendment privilege against self-incrimination in a way that suggests by implication and innuendo that the witness is guilty. See *People v. Crawford Distributing Co.* (1979), 78 Ill. 2d 70, 74, 397 N.E.2d 1362, 1365.

Again, defendant failed to object to the argument at trial and in his post-trial motion, thereby resulting in waiver. Had defendant preserved the claim, it should be noted that defendant cites no

authority to support his analogy of testimony regarding an immunity agreement and testimony invoking the fifth amendment. Indeed, the *Crawford Distributing Co.* opinion upon which defendant relies held that the invocation of the fifth amendment did not prejudice the witness because the State sought and obtained a grant of immunity. Moreover, the privilege against self-incrimination is a purely personal right that may not be invoked by a third party. (See, *e.g.*, *Hale v. Henkel* (1906), 201 U.S. 43, 50 L. Ed. 652, 26 S. Ct. 370.) The witness in *Crawford Distributing Co.* was the president and sole shareholder of the appellant, and may be said to fall within the scope of the standing rule. Defendant has shown no reason why he should have standing to object to the testimony.

Defendant claims in a related argument that the State improperly suggested to the jury that Royal Lane could have given false testimony and yet escape perjury charges, which would be a misstatement of Royal Lane's immunity agreement. The State argued during rebuttal:

> "[Royal Lane] getting up there and simply saying something and having someone else come in and dispute [it] is not perjury. We have something for one time and something for another time. It is not even applicable here."

Defendant objected at trial, claiming that this was an improper definition of the law of perjury, but was overruled. Defendant also objected in his post-trial motion.

However, the record also indicates that during closing arguments, defense counsel told the jury:

> "The State told you that in order to get [Royal] Lane to take the stand, they gave him immunity. They reminded Mr. Lane that immunity protects him from everything except perjury. That if he lied, immunity doesn't protect him."

The record shows that the State objected, claiming that this was a misstatement of the law of perjury, but was overruled.

Reviewing the record as a whole, it appears that the State was responding to defendant's argument regarding the law of perjury. Defendant cannot complain of invited comments. (*People v. Nevitt* (1990), 135 Ill. 2d 423, 454, 553 N.E.2d 368, 381.) The State's comment may be read as merely noting that conflicting testimony does not *ipso facto* mean that perjury has occurred and that any charge of perjury would not be part of the proceedings at issue.

■ Defendant contends that the State improperly asked leading questions during the examinations of Toni Ebeling and Thomas Amadio. A leading question is one that suggests the answer by putting into the witness' mind the words or thought of the answer; it is gen-

erally improper to lead a witness except on cross-examination. (*People v. Cobb* (1989), 186 Ill. App. 3d 898, 915, 542 N.E.2d 1171, 1183.) Defendant did not object to any of the questions in his post-trial motion, waiving any objection on appeal.

Moreover, had defendant preserved the objections, they would not persuade this court. The State asked Ebeling:

> "[Q]. And you indicated to Counsel that after having looked back and observing and talking with Mr. Malmgren pursuant to this transaction that you noticed that he had sort of a blank stare on his face?"

The record shows that Ebeling testified that Mr. Malmgren appeared nervous and had a blank stare. Defendant correctly notes that Ebeling had not so testified on direct or cross-examination. However, defendant's claim that Ebeling "ran with" the characterization seems to be an exaggeration. Perhaps more important is that Ebeling's characterization seems similar to Pachoca's testimony that Mr. Malmgren seemed nervous. Given this record, it would seem that any error arising from the State's question would be harmless.

As for the questioning of Thomas Amadio, the State inquired whether defendant said "anything about witnesses" or "anything about killing, or whether he knew how to kill people." The latter question was the only question of the three to which defendant objected at trial. However, it is within the discretion of the trial court to overrule such an objection where the witness may answer yes or no to the question. (*Betts v. Manville Personal Injury Settlement Trust* (1992), 225 Ill. App. 3d 882, 905, 588 N.E.2d 1193, 1208.) The trial court acted within its discretion in this case, as the witness could have answered in the negative to either of the State's questions.

Defendant claims he was prejudiced when the State asked Welch whether any expert for the defense examined the fibers at issue in this case. Defendant concedes that his objection to the question was sustained, but argues that the jury would assume that no defense expert examined the fibers. The record also indicates that the State asked Welch whether the fibers were available to the defense, which Welch answered in the affirmative.

■ In a case involving prosecutorial comment, our supreme court has stated that

> "though failure to call a witness or produce evidence may not be relied on as substantial proof of the charge, nonetheless, if other evidence tends to prove the guilt of a defendant and he fails to bring in evidence within his control in explanation or refutation, his omission to do so is a circumstance entitled to some weight in

the minds of the jury, and, as such, is a legitimate subject of comment by the prosecution." (*People v. Williams* (1968), 40 Ill. 2d 522, 529, 240 N.E.2d 645, 649.) Defendant has not demonstrated why the same logic would not apply to examination as well as comment. In this case, the record shows that the fibers were available to the defense. Thus, assuming *arguendo* that the jury would infer that defendant did not seek to refute Welch's analysis of the fibers through forensics, reversal would not be warranted. The examination does not imply that defendant had a burden to produce evidence; rather, it merely seeks to establish that the fiber analysis will not be disputed by an opposing expert.

■ Defendant argues that the State improperly impeached Royal Lane on collateral matters. (See *People v. Collins* (1985), 106 Ill. 2d 237, 269, 478 N.E.2d 267, 281.) Again, the record shows that defendant did not object to the impeachment on those grounds at trial or in his post-trial motion, resulting in waiver. Assuming *arguendo* that the argument was preserved, it would fail to persuade this court. In *Collins*, our supreme court held that it was within the discretion of the trial court to permit impeachment regarding a witness' ability to recall her activities with defendant during the week the offenses occurred.

In this case, Royal Lane was impeached regarding his ability to recall his activities with defendant on the day the murders occurred. Royal Lane testified that defendant returned to Angola no later than 2:30 p.m. on the day of the murders because he remembered speaking with his wife about the three of them going to the American Legion hall. Houlihan testified that Royal Lane previously told police that defendant arrived "later in the afternoon" and could not recall a specific time. Royal Lane testified that he did not recall seeing anyone playing cards at the Legion hall, but that somebody may have been playing cards there. Hyland testified that Royal Lane previously told the State that he did not see people playing cards at the hall. Brogan had previously testified that on the date at issue, there was a Euchre party at the hall, the patrons were playing cards in the barroom and Brogan did not see the Lanes that evening. Given this record, permitting the impeachment of Royal Lane's inability to recall details of his activities with defendant on July 1, 1985, that he apparently remembered in previous conversations was not an abuse of discretion.

■ Finally, defendant claims that the State improperly elicited irrelevant testimony that defendant had been seen with a gun in the months prior to the murders. Defendant has waived the objection not only by failing to object at trial, but also by questioning witnesses on the matter during cross-examination. (*People v. Lee* (1988), 173 Ill.

App. 3d 181, 185, 527 N.E.2d 445, 448.) Moreover, the record in this case shows that the cast bullet and the copper bullet jacket recovered from the victims' bodies had grooves consistent with a .38 caliber Charter Arms. Consequently, while far from conclusive, testimony that defendant regularly carried a .38 caliber Charter Arms has a tendency to prove defendant was the shooter.

In sum, the only improper comments in this case were those relating to whether the fibers were identical and that defendant left Angola at 6:30 a.m. on July 1, 1985. These two comments, even when considered together, do not warrant a new trial, given the facts and circumstances of this case.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

MANNING, P.J., and BUCKLEY, J., concur.